STATE of Missouri, Respondent,

v.

**Phillip Odell CLARK, Appellant.**

**No. KCD 27211.**

Missouri Court of Appeals,
Kansas City District.

Dec. 27, 1976.

Motion for Rehearing and/or Transfer Denied Jan. 31, 1977.

As Modified April 18, 1977.

Alex Bartlett, Hendren & Andrae, Thomas J. Downey, Jefferson City, for appellant.

John C. Danforth, Atty. Gen., Robert M. Sommers, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

The defendant Clark, then in service of a life term for murder, was convicted for the manslaughter homicide of his cellmate and sentenced to a consecutive term of ten years.

## I.

## PRELIMINARY STATEMENT

The victim, Charles Wright, was discovered dead in the cell he shared with the defendant and Rodney Cowen. The deputy county coroner came to the scene within minutes after discovery, and on the basis of a cursory examination, and of a more extensive laboratory inquiry later that evening, concluded that the primary cause of death was intracranial hemorrhage due to skull fracture with strangulation as a secondary cause. That night the defendant Clark made statements to Associate Warden Wyrick and two days later, on August 23, 1971, to Sgt. Fluegel of the Missouri State Highway Patrol which admitted that he had killed Wright by striking him with his fists and throttling him with a towel.

A preliminary hearing was conducted on November 24, 1971, on a complaint which charged Clark with first degree murder. Evidence was heard and the magistrate found that a felony had been committed and that there was probable cause to believe that the defendant had committed the offense. An information which charged first degree murder was lodged against the defendant in the circuit court of Cole County and thereafter, at the request of the defendant, venue of the prosecution was changed to Boone County.

In due course, Clark made formal application for mental examination under Chapter 552, RSMo 1969, to determine his fitness to proceed in the prosecution and that Dr. Tom Anderson, a private practitioner of psychiatry, be designated for that purpose. The court approved the request and certificate of examination was returned by the doctor. A competency hearing was conducted at which Dr. Anderson was the witness. It was his diagnosis that the defendant was a latent psychotic, at the time of examination competent to assist counsel in the defense of the action, but subject to a loss of rational control without outward manifestation of onset, a condition which would render him unfit to understand the proceedings against him or assist in the defense. At the conclusion of this testimony, the court ordered a further examination at the State Hospital in Fulton. The results of that examination were filed with the court and the competency hearing was resumed. On the evidence at these two hearings, the trial court ruled the defendant competent to stand trial within the meaning of § 552.020.

The defendant thereupon gave notice of his intent to rely upon the plea of not guilty

by reason of mental disease or defect excluding responsibility as provided by § 552.-030.

The information was amended on January 30, 1973, to charge a lesser offense, second degree murder, and was amended again on April 23, 1973, to charge manslaughter in response to a plea of guilty, later aborted by the equivocations of the defendant. The court allowed reinstatement of the second degree murder information. This sequence of reduced charge, equivocal plea of guilty, refusal by the court, and reinstatement of information, was repeated on December 8, 1973. The defendant was ultimately tried on the fifth amended information which charged second degree murder.

An evidentiary hearing had been held earlier on the motion of defendant to suppress the statements he made to Wyrick and Fluegel. The court entered a memorandum decision that the statements were voluntary.

The trial was to a jury. In summary, the prosecution evidence was:

On the date of the event, Wright, Clark and Cowen were cellmates in a maximum security unit. At about 10:35 p. m. on August 21, 1971, Cowen passed a note to penitentiary guard Meyer. The guard read the note and notified his superior, Captain Deardeuff, who responded by coming to the cell where he discovered the dead body of inmate Wright. The defendant was taken to Associate Warden Wyrick for interrogation, then during his return to the cell, Deardeuff heard defendant Clark tell another prisoner that he had just killed Wright.

Dr. Strong, the deputy coroner, testified as to what he observed in response to the call to the scene and gave his conclusion that the primary cause of death was from skull fracture, and secondary cause as a strangulation.

Cowen testified that he was in the cell that evening, and as he fell asleep he heard Clark and Wright argue over a card game; he later awoke to see Clark strike Wright, then place the victim in his bunk. Cowen then tossed the note to guard Meyer.

Wyrick and Fluegel testified as to the circumstances and contents of the statements given them by Clark on the night of the event and August 23, 1971, two days later, in which he admitted he killed Wright. [We treat all this testimony more extensively in conjunction with the contentions of error.]

The primary witness for defendant Clark was inmate Hicks who testified that Cowen told him the defendant did not commit the homicide. Clark then took the stand and testified he had seen Cowen hit Wright several times causing him to fall against a homemade rope which served as a towel rack. Cowen then threatened him, so Clark agreed to accept guilt. Then—according to Clark—he and Cowen contrived the story he told Wyrick and Fluegel. To prove that point, Clark described several deliberate distortions he inserted into these statements to show they could not have been true.

The prosecution called rebuttal witness Duncan, a city police officer, who testified that while he guarded Clark during a hearing, Clark admitted he had committed the crime.

The case was submitted to the jury on second degree murder and manslaughter instructions. The jury found the defendant not guilty of second degree murder, but guilty of manslaughter.

The court owes a debt of gratitude for the prodigious labors of Alex Bartlett, Esquire and Thomas J. Downey, Esquire, counsel by assignment to the defendant. The motions and hearings already described only vaguely suggest the massiveness of the litigation which culminated in the jury trial. The transcript, by incomplete count, records at least a dozen fully contested motions which ranged from attack on the sufficiency of the magistrate determination of probable cause to suppression of evidence, confessions, contentions of double jeopardy, and through a gamut of other assertions, seriously made and colorably valid. Counsel also, with patience and fidelity to the cause of defendant, advocated in a reasonable manner the numerous *pro se* motions brought by Clark. They guided the defendant through two pleas of guilty to reduced

homicide, both denied because of the vacillations of the defendant. The trial itself was conducted with the same conscientiousness as was the appeal.

We express the same gratitude to the trial judge who met every complaint of the defendant, however redundant, with patience and fairness. He carefully explained each contested decision to the defendant, and so to us. The record shows a particularly difficult litigation, strongly contested and strongly defended, kept in firm control throughout. The conduct of court and counsel has surely enhanced our system of justice.

## II.

## CAUSE OF DEATH

The contentions which make up the first point on appeal all relate to the claim that the evidence both at the preliminary hearing and at trial was insufficient to prove the cause of death and so the denial of the alternative requests for bill of particulars, direction of acquittal, or new trial were error; and specifically:

1. The evidence at the preliminary hearing did not establish probable cause to believe Clark had strangled Wright to death as alleged in the complaint,
2. The Fifth Amended Information [upon which Clark was tried] improperly charged skull fracture as an additional cause of death so that the information was fatally at variance with the complaint,
3. The Fifth Amended Information unlawfully charged in one count two conflicting methods by which Clark was alleged to have killed Wright,
4. There was not sufficient evidence of an assault or strangulation to support a verdict under Instruction 10 which submitted manslaughter.

The complaint before the magistrate of Cole County, upon which the preliminary hearing was held, alleged that Clark made "assault upon one Charles Wright with a towel, and . . . did place the aforesaid towel around the throat of the said Charles Wright and did squeeze and shut off the breath of the said Charles Wright thereby causing [his] death . . . by strangulation . . .." The deputy coroner, Dr. Strong, testified that his first examination of Wright in his cell at about 11:00 p. m. on August 21, 1971, the day of the event charged, revealed that Wright was dead. At that time, he saw blood on the mattress and an abrasion about one-half inch wide on the anterior aspect of the neck. Although autopsy was not performed, Dr. Strong later examined the body more closely in the prison hospital, and discovered a bloody fluid in the cranial cavity among other things which led him to conclude that the primary cause of death was intracranial hemorrhage due to skull fracture, and that the secondary cause was strangulation. His conclusion that the garrotting was a concomitant cause of death was based solely on the one-half inch abrasion which ran about a quarter of the way around the neck of the victim, as none of the other usual signs of strangulation were evident.

The defendant argues that the absence of the usual indices of death by throttling, along with failure of the complaint to allege death by skull fracture or cerebral hemorrhage, precluded the magistrate from the conclusion that Clark caused the victim to die by strangulation. It was not Dr. Strong alone, however, who testified on the cause of death. Wyrick, then Associate Warden at the penitentiary, gave evidence of an oral statement made to him by Clark that night, that: Clark had argued with Wright over a game of cards, which resulted in a fight in the course of which Clark struck Wright with his fists, knocked him down, choked him a first time with a towel, then as Wright continued to struggle, choked him again. Then he cleaned up the blood, packed his own belongings and waited for an officer to come, because he had seen cellmate Cowen slip a note to the guard. There was some contradiction between the oral statement given Wyrick by the defendant and his later written statement [not entered in evidence] which admits Clark choked the victim but does not mention the towel as the instrument of that

assault. There was also the testimony of cellmate Cowen that while falling off to sleep he heard a commotion, looked up and saw Clark hit Wright—who fell towards the commode; Cowen then rolled over, facing the wall, and saw nothing else until he saw Clark place Wright back on the bed.

On this evidence, the magistrate found that a homicide had been committed and that there was probable cause to believe Clark guilty of the offense. It then became the duty of the magistrate to hold the accused to answer in the court with jurisdiction of the offense. § 544.420, RSMo 1969 and Rules 23.02 and 23.08.

■ The defendant says there simply was no credible evidence upon which the magistrate could have found that defendant caused the death of Wright by strangulation, and thus there was no probable cause for the prosecution which followed. This contention misconceives altogether the function of this preliminary adjudication.

■ A preliminary examination is in no sense a trial and does not finally adjudicate the guilt or innocence of an accused. It is simply a means to prevent abuse of power by the prosecution, while at the same time to permit arrest and detention of an accused by means of a limited inquiry into whether there is probable cause that a felony was committed and that the accused was the offender. *State v. Turner,* 353 S.W.2d 602, 604[6–8] (Mo.1962); *Lambus v. Kaiser,* 352 Mo. 122, 176 S.W.2d 494, 497[6–8] (1943). The magistrate is the sole judge of the sufficiency of the evidence on these ultimate issues and—in the absence of fraud or arbitrary conduct—that determination is not subject to review by the courts. *State v. Hester,* 331 S.W.2d 535, 537[4–5] (Mo.1960); *Ex parte Cloud,* 224 Mo. App. 50, 18 S.W.2d 562, 563 (1929); *State v. Jeffries,* 210 Mo. 302, 109 S.W. 614, 620 (1908). The preliminary examination is nonetheless a judicial proceeding, and insofar as the magistrate acts within a lawful jurisdiction, his decision on the evidence binds the proceeding when it is wrong as when it is right. 21 Am.Jur.2d, Criminal Law, § 443. The jurisdiction of a circuit court to try for felony does not derive from the adjudication of the magistrate, but comes originally from the formal accusation by indictment or information. *State v. Ferguson,* 278 Mo. 119, 212 S.W. 339, 341[1] (banc 1919); Article 1, § 17, Constitution of 1945. The contention that § 544.370, RSMo 1969 which requires that:

> In all cases of homicide, but in no other, the evidence given by the several witnesses shall be reduced to writing by the magistrate, or under his direction, and shall be signed by the witnesses respectively

evinces a purpose that where such a record before the magistrate has been preserved, a court may review the sufficiency of evidence for probable cause was explicitly rejected in *Ex parte Cloud, supra,* l. c. 563. That court reasoned that the provision of statute that the preservation of testimony shall be taken in cases of homicide, *but in no other,* amounts to a legislative declaration that a superior court may not annul the finding of the magistrate on the evidence. That provision, rather, secures to an accused a fair preliminary hearing and a basis for the examination of witnesses on the trial of the offense. *State v. Banton,* 342 Mo. 45, 111 S.W.2d 516, 519 (banc 1938).

The alternative contention of the defendant argues that he was unlawfully convicted of a felony not charged in the complaint in violation of § 544.250 and Rule 23.02. Those procedures prescribe that no felony information shall be filed against any person unless the accused first was accorded the right to a preliminary examination before a magistrate. The defendant contends specifically that the preliminary hearing was conducted on a complaint which alleged that he caused the death of Wright by strangulation with a towel, while the fifth amended information upon which he was convicted added the allegation that he caused death by an assault with his fists upon Wright which resulted in a fracture of the skull. This argument relies on *State ex rel. Buresh v. Adams,* 468 S.W.2d 18 (Mo. banc 1971).

That case was an original proceeding in prohibition to enjoin the trial court from further jurisdiction in a felony trial on the

ground that no preliminary hearing was held on the accusation of the information. The defendant was given a magistrate hearing on a complaint which alleged in Count I acts of embezzlement from July, 1966, to October, 1968. The magistrate bound defendant over for trial on that count, but the information which was then filed in the circuit court charged the criminal acts took place between July, 1959, and January, 1969, and were one continuous scheme, an allegation not made in the complaint. The court ruled [l. c. 22] that the allegations of the information, although included within their scope the allegations of the complaint, constituted a substantial departure from the complaint so as to charge defendant with additional and different offenses than heard by the magistrate.

In order to bring the present case within the principle of *Buresh* the defendant must show that the addition of the skull fracture as a cause of death constitutes a substantial departure from the complaint. *Buresh* follows the general rule expressed in 21 Am. Jur.2d, Criminal Law, § 451 [also, 42 C.J.S. Indictments and Informations § 73]:

> An information filed after a preliminary examination has been held does not have to correspond with the complaint filed with the magistrate. The prosecuting attorney is authorized to file an information charging the offense for which the accused was held, or substantially the same offense. He may not add a new offense. And he may not file an information charging an offense completely different from that shown on the preliminary examination.

Here, the complaint charged first degree murder by strangulation, while the information alleged second degree murder by strangulation and skull fracture. It bears repeated comment that the magistrate does not determine guilt or innocence, nor does he nicely and irrevocably determine the precise offense of which the accused is guilty. Thus, the magistrate need not define the precise degree of the crime committed [*State v. Ancell*, 333 Mo. 26, 62 S.W.2d 443, 446[2–4] (1963)] and an information may charge an offense included in

the complaint. 42 C.J.S. Indictments and Informations § 73, p. 932. A complaint which alleges first degree murder includes the lesser homicides. *Ancell, supra,* 62 S.W.2d l. c. 446. Thus, a charge of murder of second degree in the information cannot be seen as a different offense from that alleged in the complaint.

Nor does the addition of the allegation of death by skull fracture constitute a substantial departure from the complaint. It is not necessary that an information which charges murder allege the manner in which the deceased was killed [*State v. Courtney*, 356 Mo. 531, 202 S.W.2d 72, 73[3, 4] (1947)], and any such allegation constitutes surplusage. *State v. Johnson*, 457 S.W.2d 795, 799[7] (Mo.1970). Any difference between the descriptions of the cause of death in the complaint and information becomes immaterial. Unlike *Buresh,* here the substance of the charge remains the same; that is, that in some felonious manner, Clark caused the death of Wright.

The defendant next contends that the information should have been dismissed—or at least a bill of particulars ordered as requested alternatively—because the allegations as to the cause of death were contradictory. The defendant does not describe the contradiction but merely cites extensive portions of *State v. Reakey*, 62 Mo. 40 (1876) and *State v. Reed*, 154 Mo. 122, 55 S.W. 278 (1900) where indictments were held fatally defective because of the way the cause of death was described. In *Reakey*, the indictment charged in effect that defendant simultaneously strangled the victim and struck her with a stick, both acts with his right hand. The court noted that the evidence was wholly circumstantial and that either theory—strangulation or assault by stick—was equally plausible as a cause of death, but that it was impossible to tell on which charge the jury returned guilt. This confusion was significant, for if the verdict was based on the assault with a stick theory, the indictment would not support a charge of murder in the first degree. The court also expressed doubt of the logic of the indictment which alleged that death was caused by simultaneous acts which

were, in fact, impossible of coincident execution.

The indictment in *Reed, supra,* cited by defendant, charged death from the blow of a pick, but the evidence proved death from a fall caused by an assault with fists by defendant. The court reversed the conviction on the theory that this evidence was at fatal variance with the indictment.

Two later cases greatly reduce the impact of *Reakey* and *Reed.* The defendant in *State v. Rizor,* 353 Mo. 368, 182 S.W.2d 525 (1944) relied on *Reakey* to challenge an information which alleged he killed the victim either with his hands or fists, or with a blunt instrument, or with a blunt instrument alone. The court first ruled that an information may not be attacked after verdict for indefiniteness in the description of the way the crime was committed, and then noted [182 S.W.2d l. c. 527] the general rule that an information or indictment may charge that a murder was committed by different means or weapons, and be sustained by proof of either.

The information in *State v. Brinkley,* 354 Mo. 1051, 193 S.W.2d 49 (1946) charged that defendant beat the victim with fists and feet which caused a head injury and death. The evidence showed death was caused by injury in the fall precipitated by the blow. Defendant relied on *Reed* and argued that this intervening cause represented a failure of proof, since it was not alleged in the indictment. The court refused to follow *Reed* [193 S.W.2d l. c. 55]:

> We think it is wrong in principle and should be overruled, or limited to special circumstances where its conclusion may properly be applicable. So far as that one point is concerned, *a person is criminally responsible for a homicide in whatever manner or by whatever means it was accomplished, provided it was proximately caused by his unlawful act.* And the unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened. (Emphasis added.)

These two cases rule the facts here and require rejection of the argument of defendant. First, there are no contradictions in the allegations—the information charges that defendant struck the victim, causing him to fall resulting in a skull fracture and then strangled him, and that both acts caused death. The information does not allege impossible simultaneous acts, as did *Reakey.* Second, allegations as to the manner of death are surplusage and render insignificant any inconsistency so long as one of the causes of death is supported by proof. *State v. Courtney,* 356 Mo. 531, 202 S.W.2d 72, 74 (1947); *State v. Johnson,* 457 S.W.2d 795, 799 (Mo.1970). And, as will be seen, strangulation as a cause of death was supported by the proof at trial.

The final component of this argument contends that the conviction for manslaughter does not rest on substantial evidence. The information alleged death by strangulation and skull fracture. Instruction No. 10 directed a verdict for manslaughter if the jury find that defendant caused the death of Wright by strangulation, but without malice and premeditation. The instruction does not mention skull fracture as a cause of death. The defendant cites *State v. Lusk,* 452 S.W.2d 219 (Mo. 1970). In that case, the trial court was found to have erred by an instruction which required conviction of first degree murder on the disjunctive submissions that defendant caused death by an assault upon the victim and by exposing him to the elements, such that either the assault or exposure or both caused the death. This disjunctive submission was found to be defective in two respects: exposure as a method of death was not alleged in the indictment, and assault was not proven by substantial evidence as a cause of death.

Manslaughter instruction upon which defendant Clark was convicted, on the other hand, was on a finding of strangulation, one of the methods of death alleged in the information. The issue here is whether there was substantial evidence to support the jury finding that Clark caused the death of the victim by strangulation. *Lusk* holds [l. c. 223] that cause of death may be established in a prosecution for unlawful

homicide without resort to expert medical testimony where from the facts in evidence "every person of average intelligence would know from his own experience or knowledge that the wound was mortal". That court concluded that evidence of blood around the head and mouth—as well as other body marks—were not such physical manifestations from which an average lay juror could form a well grounded opinion of causation.

The evidence which convicted Clark of manslaughter by strangulation is much more extensive. In *Lusk*, there was no expert testimony as to the cause of death; here Dr. Strong gave expert testimony on that element of proof. He concluded that the cause of death was medullary failure due to intercranial bleeding or hemorrhage, with strangulation as a concomitant cause. He did not attribute strangulation as the primary cause because of the absence of certain normal signs of such an event—facial discoloration and hemorrhage. He saw no marks on the neck of the victim which would indicate strangulation by hand, but that either the towel or length of cord discovered in the cell could have been the instrument of death. These medical conclusions were corroborated by the statements made by defendant to Associate Warden Wyrick and Highway Patrolman Fluegel. In each of those confessions, Clark admitted that he first choked Wright with his hands, then with a towel, and then again with a towel. This evidence conjoined with the testimony of Dr. Strong amounts to substantial evidence that strangulation was a cause of death.

The further contention that Instruction No. 10, which alleges assault with the hands in connection with the strangulation, does not follow the information which ties the assault to the skull fracture, has no merit. The information alleges that defendant "did . . . make an assault upon . . . Wright and did . . . strike [him] . . . thereby causing the fracture of his skull, and did . . . [strangle him with a towel] . . .". The instruction merely refers to the assault and strangulation without mention of skull fracture, a submission clearly compatible with the allegations of the information.

III.

THE COMPETENCY PROCEEDINGS

The defendant next raises a number of issues on his competency to stand trial.

On September 11, 1972, counsel for defendant made application for a mental examination under §§ 552.020 and 552.030 and requested that the inquiry be conducted by Dr. Tom Anderson, a private practitioner in psychiatry in Columbia, rather than at the Fulton State Hospital. The application represented that from his conferences and correspondence with defendant, counsel had reason to question that Clark was mentally competent at the time of the alleged offense, and also his present capacity to appreciate the nature and degree of the charge against him and his competency for rational decision in the defense of the cause. Counsel made particular reference to a conference with the client on September 8, 1972, when Clark displayed extreme nervousness and expressed irrational ideas about his defense. At the presentation to the court, counsel was emphatic that the application was not made at the request of the client, but as a measure of his own duty. The prosecution consented to the request and the trial court ordered the examination by Dr. Anderson, as requested by counsel, to determine the competency of defendant to stand trial and his responsibility for the acts alleged against him. On September 21, 1972, at the request of Dr. Anderson, the court ordered additional tests by Dr. John Somers.

A hearing was conducted on the competency issue. The prosecutor assumed the burden of proceeding with the proof and undertook examination of the witness. Dr. Anderson testified that he conducted a sixty-five minute examination of the defendant at the penitentiary and concluded that at that time Clark was competent to assist counsel and to understand the nature of the court proceedings. This finding was qualified by a further diagnosis: that Clark suffered from a borderline or latent psychotic condition not always accompanied by out-

ward manifestations, but which caused him to lapse without prediction or notice into a condition where he was not competent to stand trial or capable to assist in his own defense. The condition was so deceptive that even his own counsel would not necessarily know from moment to moment whether the client remained rational. Dr. Anderson could give no assurance that the competency to stand trial he found at the time of examination would continue.

This testimony prompted the court to suspend proceedings and initiate an additional mental examination at the State Hospital in Fulton to determine competency to proceed and responsibility for the criminal conduct alleged. Counsel for defendant objected to the order on the grounds that his client did not request the examination and was disinclined, in any event, to submit to Fulton. The court made clear that he would accede to any request by either party for further independent examination once the Fulton report was made.

The defendant was committed to Fulton and remained there for some two months during which he was subjected to a battery of psychological tests and a formal twenty minute examination by three staff psychiatrists. The results of these tests and observations were compiled in a report filed with the court. The defendant moved to strike the report, on allegations that the court was without jurisdiction to order the examination and that the examining physicians were not qualified psychiatrists as contemplated by Chapter 552.

The hearing to determine the competency of defendant to stand trial was resumed on January 30, 1973. The court expressly ruled, that for purposes of the hearing, the burden of going forward with the evidence rested on the State. Dr. Jacks, a staff physician at Fulton who had examined Clark, was called. He was a doctor of osteopathy and fifth year resident at Fulton and worked in the unit assigned to the pre-trial evaluation of those charged with crimes. He had participated in the twenty minute formal examination of defendant, and based on this evaluation and the results of the psychological tests and his observations of defendant during his confinement at Fulton, he was of opinion that defendant was competent to stand trial. Dr. Jacks further testified that brain wave studies disclosed no organic disabilities. The defendant did not show any intellectual deficit and enjoyed an I.Q. between 93–95. The witness concluded that the term "borderline psychotic" [used by Dr. Anderson to describe the mental condition of the defendant] was vague and thus unsatisfactory for psychiatric diagnosis. It is a term sometimes used to describe a person who shows signs of psychosis when under stress, but who appears normal when stress is removed. The doctor testified also that the medical history in the Fulton report shows Clark had suffered two severe blows on the head, facts compatible with indications of minimal organic brain damage. In all, the defendant had been cooperative with the staff while at Fulton.

Dr. Jackson, director of the staff at Fulton, who also participated in the formal evaluation of defendant, reached the same conclusion as his colleague: that Clark was able to understand the proceedings against him and to assist in his own defense. This opinion rested primarily on the confinement at Fulton, although the examiner was aware of the history given by Clark during prior commitments at Fulton[1] and at Farmington State Hospital.[2]

---

1. Clark was committed to Fulton in 1966 for pre-trial evaluation of competency for the first degree murder of his grandmother-in-law for which he was convicted and in service at the time of the homicide of his cellmate. He was then diagnosed as "sociopathic personality, antisocial type, moderate" but found competent to stand trial.

2. Clark also related a history of previous psychiatric hospitalization at Farmington at the age of eleven but was not aware of the reasons for that admission. In 1966, according to Clark, he was readmitted there following a nervous breakdown.

The defense then put on three witnesses who had been confined at Fulton at the time appellant was there. Garrison Lee Rhoades testified that he had seen Clark at the hospital and defendant did not have any problems with the staff. Gary Lee French testified that the Fulton attendants harassed the defendant. Solomon T. Williams testified that the staff did not seem to like Clark and on one occasion placed him in solitary confinement.

The defense then put on Thomas Downey, co-counsel, who gave an account of the contradictory and irrational conduct of his client during their consultations and preparations for defense. Clark could not be kept to a single focus of discussion, but flitted from subject to subject, so that possible defenses could not be satisfactorily explored or developed. Then, his notions of alternatives were clouded: he maintained his innocence but insisted that counsel should assure him the death penalty if convicted; he wanted to plead guilty and yet insisted on a trial by jury. As evidence that Clark was confused and did not understand the nature of many of the pro se motions he filed, counsel referred to a petition for writ of habeas corpus brought by defendant designed to get him out of maximum security, even though he was placed there at his own request for his safety. These and other attitudes of the defendant were given in detail to support his premise that Clark did not have the capacity to understand the proceedings or assist counsel in the defense. When Downey was asked his opinion of the competency of his client to stand trial, objection by the State that the witness was not qualified to give the opinion was sustained by the trial court. In his offer of proof, Downey concluded he did not believe Clark was competent for that purpose.

The defendant concluded the evidence at the hearing by his testimony that he was competent to stand trial. The motion to strike the psychiatric report was overruled and the court found Clark competent to stand trial and assist in his own defense. The defendant contends these proceedings were erroneous in four respects:

1. That under § 552.020 the State has the burden to prove a criminal defendant competent to stand trial and the failure of the State to carry that burden at the October 20, 1972, hearing exhausted the jurisdiction of the court to order further mental examination;

2. The Fulton State Hospital report was the product of improper procedures, was formulated by persons not qualified as psychiatric examiners and in a manner too cursory for proper evaluation and should not have been considered as evidence;

3. The disallowance of the opinion by counsel Downey that his client was not fit to proceed;

4. The record as a whole does not support the determination that defendant was competent to stand trial.

The first argument rests on the assumption that *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) mandates that the State has the burden to show the competency of an accused to stand trial. The argument contends further that the State did not meet this burden at the competency hearing of October 20, 1972, and thus the trial court had no jurisdiction to order a further examination, but rather should have determined defendant lacked the mental fitness to proceed and suspended the proceedings against him as provided by § 552.020(7).

■■■■ The defendant misreads *Pate*. That case decides only that where circumstances at the criminal trial create doubt of the fitness of the accused to proceed, due process of law requires the trial court, even in the absence of request, to conduct a hearing on the question. The court did not consider the burden of proof issue but found a bona fide doubt as to the competency of the accused to stand trial on the uncontradicted testimony that the defendant had a long history of disturbed behavior.

■■■■ The principle which will not tolerate conviction of an accused who lacks

capacity to consult with counsel and to understand the proceedings rests on values of public conscience—quite apart from considerations of guilt or innocence. *Miller v. State,* 498 S.W.2d 79, 83[5] (Mo.App.1973). Our § 552.020 reflects this decorous principle as a requirement of due process as well. Thus, the statute expressly provides that, not only must a trial court, who has reasonable cause to believe the accused suffers from a mental disease or defect which affects his fitness to proceed, order psychiatric examination and determine that issue [as *Pate* mandates], but allows the prosecutor or the defendant to share that initiative. *Dabbs v. State,* 489 S.W.2d 745, 747 (Mo. App.1972); *McCarthy v. State,* 502 S.W.2d 397, 403[6] (Mo.App.1973). That procedure provides a precaution for the integrity of the criminal proceedings, and does not determine guilt or any other element of the substantive offense. The question of competency to proceed is only preliminary, and under § 552.020(7), exclusively for the trial judge, not the jury. [See, *United States v. Maret,* 433 F.2d 1064, 1067[3–6] (8th Cir. 1970) which adopts the same view for federal counterpart, 18 U.S.C. § 4244.] It is an issue, moreover, which a defendant does not waive by going to trial, for the law assumes a mental incompetent lacks capacity to understand a right, let alone give it up. *Pate, supra,* 86 S.Ct. l. c. 841; *Taylor v. United States,* 282 F.2d 16, 23 (8th Cir. 1960). Thus, a court must confront and determine the issue at whatever stage of the trial it may arise.

 It is evident that to conform with these conditions of due process, the procedures of § 552.020 must be construed as essentially non-adversarial. Traditional burden of proof has no meaning in such a context.[3] The only burden which exists rests on the trial judge to satisfy himself that the accused is or is not competent to stand trial. To that end, § 552.020 must be construed to confer upon the trial judge broad discretion to order further examinations in order to provide sufficient evidence for this determination, in a manner consistent with procedural safeguards.

 The first psychiatric report by Dr. Anderson that the defendant was a borderline psychotic, a condition [by his own definition neither predictable nor certainly manifested] may be valid as a medical judgment, but was inconclusive as evidence on the serious legal issue before the court. In that light, the order of the court for further mental examination was not an abuse of discretion, but a conscientious reach for the truth. The fairness of the inquiry was enhanced by the reservation to each party by the court to request further independent examinations. The court neither lost jurisdiction to act further after the initial competency hearing, nor abused discretion by commitment of defendant to Fulton for further mental examination to determine fitness to proceed.[4]

---

**3.** The determination under § 552.030 of responsibility of an accused for criminal conduct is a different inquiry altogether. That section provides:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law.

It is a defense which only the defendant may initiate [§ 552.030(2)]—and not a matter of sua sponte notice by a court—and if accepted by the prosecutor or believed by the jury results in an acquittal of the substantive charge [§§ 552.030(2) and (8), § 552.040], but on which he bears the burden to prove and overcome the presumption that he is free of mental disease or defect excluding responsibility for his conduct.

[§ 552.030(7)]; *State v. Holmes,* 439 S.W.2d 518 (Mo.1969)]. Such a proceeding, obviously, partakes of an adversary nature, as it goes directly to the question of guilt or innocence. It is therefore, proper, for those cases, to frame the issue in terms of presumption and burden of proof.

**4.** *Briggs v. State,* 509 S.W.2d 154 (Mo.App. 1974) granted habeas corpus because contradictory findings of mental disease or defect from an examination ordered under § 552.020 raised a bona fide doubt of fitness to proceed which should have been further adjudicated. *Feguer v. United States,* 302 F.2d 214 (8th Cir. 1962) construed § 4244, federal counterpart of § 552.020. The defendant attacked the propriety of a second competency examination, held during the course of trial, because he had already been examined for fitness to proceed

The second element of this point on appeal contends that the psychiatric reports submitted by an overworked staff at Fulton should not, for numerous reasons, be accorded weight as evidence. The argument on this point is not only tendentious, but without support of legal authority or rationale, and deserves no serious response.

The next contention complains that the trial court improperly excluded the opinion of counsel Downey that his client, the defendant, lacked competency to stand trial. We agree that the lay opinion of counsel Downey should not have been excluded from evidence, for it is settled that a non-expert witness may express an opinion on the insanity or unsoundness of mind of an accused if the witness states facts to support the conclusion. *State v. Rose*, 249 S.W.2d 324, 332[9–11] (Mo. banc 1952). The basic qualification for such lay opinion rests on some assuring opportunity to observe the defendant—a condition fully met here. *Turner v. American Sec. & Trust Co.*, 213 U.S. 257, 260, 29 S.Ct. 420, 53 L.Ed. 788 (1909); *Parks v. Marshall*, 322 Mo. 218, 14 S.W.2d 590, 595[10, 11] (1929); 7 Wigmore on Evidence, § 1933, 3d ed. (1940). Rule 73.01(3)(c) and counterpart § 510.310 RSMo 1969 provide that where the trial court determines facts without a jury, the appellate court shall consider admissible evidence which was rejected by the trial court and preserved. The full testimony of witness Downey which described the variable moods, irrational suspicions and other erratic conduct of his client O'Dell, as well as the conclusion of the witness that the defendant was fit to proceed, are all before us. The competency of this opinion, as well as the evidence offered to support it, were given to the trial court for preliminary determination outside the presence and hearing of the jury. The rejection of this testimony and opinion, therefore, was a determination of fact within Rule 73.01 and our review requires consideration of this admissible evidence rejected, but preserved. On consider-

ation of all the evidence, both received and improperly excluded, we conclude that the defendant was competent to proceed within the meaning of § 552.020.

The final attack on the § 552.020 proceeding contends that the record of that adjudication, considered in totality, does not support the finding of the trial court that defendant was fit to stand trial and assist in his own defense.

The scope of review of a hearing and determination under that provision of statute has not been previously declared. The federal courts follow the rule that the trial court determination of competency at a § 4244 hearing is a finding of fact which will not be set aside unless clearly arbitrary or unwarranted. *Feguer v. United States*, 302 F.2d 214, 236[1, 2] (8th Cir. 1972); *United States v. Schaffer*, 433 F.2d 928 (5th Cir. 1970); *In re Harmon*, 425 F.2d 916 (1st Cir. 1970). This scope of review conforms to Rule 52 of the Federal Rules of Civil Procedure which provides:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Rule 73.01, the Missouri counterpart, excludes the *clearly erroneous* standard of review [See Committee Notes 1974—Rule 73.01] and provides that all cases tried without a jury shall be reviewed "upon both the law and the evidence as in suits of an equitable nature." This standard has been construed to mean "that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

before commencement of trial. The supplemental hearing was found to be entirely consistent with the purposes of § 4244, and so was sustained.

Such a standard of review is particularly appropriate here, insofar as defendant challenges the sufficiency of the fact-finding on competency rather than adequacy of procedural safeguards. The contentions that the trial court improperly considered and gave weight to the Fulton certification by physicians not properly qualified for that purpose must be overruled. The physicians who formally prepared and submitted the report were all licensed physicians and thus qualified under § 552.020 to conduct the examination. *State v. Mullen*, 532 S.W.2d 794 (Mo.App.1975). Their extensive experience in this field qualifies them for opinion. Their evidence was competent and considered with the psychological tests, results of observation, and other proof, was substantial for the determination of competency reached by the trial court.

## IV.

### DELAY IN FILING CHARGES

The defendant has complained by pro se memoranda during the course of the prosecution that the trial court should have dismissed the prosecution because the three months delay between arrest and formal complaint before the magistrate prejudiced his defense. Counsel brings the complaint to our attention on behalf of the defendant once again on this appeal. The motion for new trial does not preserve the point, however, so no foundation for review appears.

## V.

### REFILING OF INFORMATION

Another point asserted pro se during the proceedings and now reasserted for defendant by counsel in the brief contends that the trial court erred by allowing the State to amend the information to charge a more serious offense after the accusation had been reduced to manslaughter.

The original information accused Clark of the first degree murder of Wright under § 559.010 then still in effect. The information was thereafter amended to charge homicide without deliberation, that is, second degree murder. On two later occasions the prosecution reduced the second degree murder information to manslaughter to accommodate the intention of defendant to plead guilty to the lesser charge. Both times defendant equivocated in his plea, the trial court refused to accept it, and allowed the prosecutor to refile the second degree murder information. The defendant now contends this procedure violated Rule 24.02 by permitting the State to amend the information to charge an additional or different offense then originally charged. This contention has no merit.

An indictment for murder in the first degree embraces every grade and degree of criminal homicide. *State v. Moxley*, 115 Mo. 644, 22 S.W. 575, 577 (1893). A conviction for manslaughter, therefore, may be properly returned on an information which charges murder. *State v. Vincent*, 321 S.W.2d 439, 441[3] (Mo.1959). Although manslaughter stands as a separate offense [*State v. Foster*, 338 S.W.2d 892, 895[4–7] (Mo.1960)], historical affinity and the reality that death is the foundation of the crime have confirmed murder and manslaughter as different grades of felonious homicide. Perkins on Criminal Law, 2d ed. 1969, p. 86; 40 Am.Jur.2d, Homicide, § 54.

There is no contention that a conviction for manslaughter may not stand on an information reduced from first to second degree murder, both offenses which include manslaughter. The contention here is that an information for manslaughter amended to the more inclusive second degree murder, charges a different offense in violation of Rule 24.02 so that a conviction on such an information—albeit for the lesser offense—cannot stand. Whatever may be the validity of such an hypothesis as an abstract principle, the point defendant attempts here is purely artificial and results from a condition of his own making.

After a year of discussion between his counsel and the prosecutor, the defendant agreed to plead guilty to manslaughter. It was an offense included within the allegations of second degree murder, and thus

the plea and conviction for manslaughter were validly within the information as it then stood. The defendant felt, however, that whatever possibility of eventual parole was left open to him would be better served by a manslaughter charge on the record rather than one for second degree murder. The subsequent amendment of the information to the lesser charge was done by the prosecutor merely to accommodate that objective of the defendant. When the two pleas failed, that contingent purpose failed as well. It would demean the administration of justice to allow a defendant by such a ploy to subvert an otherwise fair and regular criminal proceeding.

We are not confronted here with an information originally found in manslaughter amended to allege murder. Such an amendment would introduce new elements of proof and defense, a different charge altogether, a practice prohibited by Rule 24.02. This point is ruled against the defendant.

## VI.

### MOTION TO SUPPRESS CONFESSIONS

This point, as were the preceding two, is asserted by counsel at the insistence of defendant.

An evidentiary hearing was held prior to trial on the motion to suppress statements given by defendant to Associate Warden Wyrick and Highway Patrol Sgt. Fluegel. The trial court found the statements were voluntarily given and in compliance with *Miranda*. At the trial, these statements were received in evidence. The defendant took the stand to deny their truthfulness and to claim they were not voluntary. The issue was submitted to the jury by instruction.

■ The statements to Wyrick and Fluegel were preceded by a document, executed by defendant, which informed the signatory of the *Miranda* rights and also constituted a waiver of them. The defendant contends this form was deficient because it merely informed him that "anything you say can be used against you in

court", whereas *Miranda v. Arizona*, 384 U.S. 436 [l. c. 469], 86 S.Ct. 1602 [1625], 16 L.Ed.2d 694 requires that an accused be informed that "anything said *can and will* be used against [him]". (Emphasis added.)

The question is not the form of the warning but whether the substance of the *Miranda* information is conveyed to one suspected of crime. *Evans v. Swenson*, 455 F.2d 291, 295 (8th Cir. 1972). The defendant made no claim at the evidentiary hearing that he did not understand his statement would be used against him and the trial judge expressly found that in both instances defendant had been fully advised of his rights. There is no basis in evidence to disturb those findings.

■ The defendant next asserts that his request to call an attorney before his statement to Sgt. Fluegel was denied, thus rendering that confession inadmissible. Sgt. Fluegel and Lt. Tandy Williams of the penitentiary both testified at the hearing that no such request had been made and that they first learned of this wish when defendant paused while writing his statement, remarked that his request for an attorney had been denied, and then inscribed in the confession he was composing:

Before giving them the statement, I informed them that I had hereto requested to make a telephone call to my counselor, Mr. Hugh McPheeters, and this was denied me.

Fluegel and Williams both testified that prior to the statement defendant had requested to make a phone call but did not state whom he wanted to call. Fluegel denied the request because he did not have authority to give such permission. The defendant testified he asked both Fluegel and Williams to be allowed to telephone his attorney, but finally told them he would write a statement but would refer to their denial of this request in that statement.

The trial court, in memorandum decision, resolved this conflict in testimony by finding beyond a reasonable doubt that defendant made request for a telephone call but without specific purpose to communicate

**472**

with an attorney. This determination is on substantial evidence, hence the contention is denied.

The final argument on this point contends that the statements are involuntary on their face as evidenced by certain narratives defendant deliberately contrived to include in the writings—such as "Mr. Wyrick helped me in the past" and marks with covert meanings—all matters known to be untrue. The defendant does not say how the trial judge could have known, upon objective examination of the writings, that the statements included deliberate mistakes and that the markings were signals of coercions rather than inadvertent errors.

■ The evidence as a whole shows that defendant had been informed of his constitutional rights, that he knowingly waived them, and that no physical coercion, threats or promises were used to obtain the statements. This proves prima facie voluntariness. *State v. Garrett*, 510 S.W.2d 853, 854 (Mo.App.1974). In the absence of evidence by the defendant, thereafter, which conclusively shows the confession was involuntary, the issue goes to the jury. *State v. Hunter*, 456 S.W.2d 314, 316 (Mo.1970). The proof of defendant falls far short of that requirement; the trial court determination that the statements were admissible must stand.

## VII.

### CLOSING ARGUMENT

■ The defendant next assigns error for failure of the court to grant a new trial because of reference by the prosecutor in closing argument to the prior murder conviction of the defendant. These are the words in controversy:

That's how he got the mark on his neck. That's not my story; it's his story. Already convicted of murder.

Cowen was honest with you. He said he was a thief, and that's possibly what he is. There wasn't any evidence that Cowen ever committed any violent crime at all.

We have here a man who stands convicted of first degree murder.

Objection was made that these references to prior conviction were improper within the context of the argument and should be stricken. The objection was sustained and the court ordered the jury to disregard the comment. The defendant now contends that these statements were so inflammatory as to have required the court, even in the absence of request, to declare a mistrial. The cases cited for this contention, *Leaman v. Campbell 66 Express Truck Lines*, 355 Mo. 939, 199 S.W.2d 359 (1947) and *Calloway v. Fogel*, 358 Mo. 47, 213 S.W.2d 405 (1948)—both of which involved closing arguments so palpably improper as to require a new trial despite absence of trial objection—simply do not apply to these circumstances. The jury here was already aware that the defendant was in service of a conviction for murder at the time of the commission of the offense for which he was on trial. That fact had come out in his own testimony. The jury was also aware that defendant had earlier been convicted for thievery. The reference of the prosecutor—now in controversy—was merely an aspect of the larger argument of credibility between the confessions of guilt to Wyrick and Fluegel and the trial testimony that cellmate Cowen had actually done the homicide. Conviction for prior crime bears on credibility and may be argued for jury consideration in issue of guilt or innocence. *State v. Brogan*, 488 S.W.2d 623, 625[2] (Mo.1973). If it can be said that the argument unduly emphasized the prior conviction for murder, even for a legitimate purpose, no abuse of discretion appears from failure of the court to declare a mistrial without request or a new trial with request. *State v. Brauch*, 529 S.W.2d 926, 931[7–9] (Mo.App.1975).

## VIII.

### BURDEN OF PROOF INSTRUCTION

■ The defendant next alleges a conflict between the formal reasonable doubt instruction and the burden of proof instruction. The first casts upon the State the

burden "to prove beyond a reasonable doubt that the defendant is guilty"; the second authorizes an acquittal but only on "a substantial doubt [of] . . . guilt, and not a mere possibility of . . . innocence". The argument is that the latter instruction unduly dilutes the first and, in effect, impairs the presumption of innocence. It is enough to say that this case was tried before the effective date of MAI–Cr 2.20 which now governs such submissions. The instructions challenged here are in the form and substance repeatedly upheld before MAI–Cr. *State v. Scott*, 491 S.W.2d 514, 520[11] (Mo. banc 1973).

## IX.

### VALIDITY OF HABITUAL CRIMINAL ACT

▮▮▮ The final contention argues that § 556.280, RSMo 1969, the Habitual Criminal Act under which defendant was tried, violates the equal protection and due process clauses of the Fourteenth Amendment. The statute has been held immune to such attack. *State v. Maxwell*, 411 S.W.2d 237, 239[1, 2] (Mo.1967). Contrary to contention, the fact that a prosecuting attorney has total discretion to charge under the act is a legislative delegation of duty to the administrative function of that office and requires no further definition for implementation. *Wilwording v. State*, 438 S.W.2d 447, 449[2] (Mo.1969).

The judgment is affirmed.

All concur.