STATE of Missouri, Respondent,

v.

Samuel E. HALEY, Appellant.

No. 62132.

Supreme Court of Missouri,
Division I.

July 15, 1980.

Rehearing Denied Sept. 9, 1980.

Kevin Locke, Gary L. Gardner, Asst. Public Defenders, Kansas City, for appellant.

Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

WELBORN, Commissioner.

A jury in the Macon County Circuit Court (on change of venue) found Samuel E. Haley guilty of two counts of assault with malice with intent to kill and two counts of robbery in the first degree, fixing the punishment at life imprisonment for each of the offenses. This appeal is from the ensuing judgment and sentence to four consecutive terms of life imprisonment.

According to the victims, a man and a woman, Samuel E. Haley, who was known

to them, came to their apartment in Kansas City on February 13, 1978, and took money and jewelry from them at gun point. He then forced the victims to lie on a bed, placed a pillow over each of their heads and fired his gun into the pillows. The missile failed to penetrate the pillow. When the woman raised up after the shots had been fired, she was shot again, resulting in injuries requiring lengthy hospitalization.

Defense was an alibi, supported by testimony of the defendant and others.

The first point on appeal contends that the trial court erred in failing to order a psychiatric examination of appellant because there was reasonable cause to believe that appellant was suffering from a mental disease or defect within the meaning of Chapter 552, RSMo.

On July 10, 1978, after the jury had been selected, the following transpired in chambers. Inasmuch as the appellant's remarks at this time are the basis of the claim of error, the entire conference (omitting remarks of the prosecutor) is set out.

"COURT: Just show we're in chambers and that counsel for the State, the Defendant and his counsel, are present. As I understand it, Mr. Johnson, you had a matter you wanted to call to the Court's attention.

"MR. JOHNSON: Your Honor, my client advised me by letter received Saturday that he thought he might have a defense under Chapter 552. He has shown me some medical records which stem from an incident in which he was found blacked out next to an automobile in November, 1977.

"DEFENDANT: In July, 1977.

"MR. JOHNSON: July, 1977. The medical records continue through the late summer months and early fall months. No EEG was ever taken—at least at that time. At any rate, all this information has come to me for the first time in the last four days. I have not filed a motion for mental examination, and, other than my client's assertions, I have—not only do I believe the motion to be untimely, I am not . . . My relationship with the Defendant is such that I had no reason to think he had a

defense under Chapter 552. I know that Mr. Haley would like to say some things in the record, and I wish him to have the opportunity, knowing it is within your discretion to adjourn these proceedings and order a mental examination. Do you wish me to ask Mr. Haley questions, or do you wish to direct questions—

\* \* \* \* \* \*

"INTERROGATION BY MR. JOHNSON:

"Q. Mr. Haley, is it true that you wrote me a letter asking me to assert a defense of mental illness or temporary insanity in your behalf?

"A. Yes, I did.

"Q. When was that letter written?

"A. Written Thursday, but you could not get it until Saturday. They wouldn't let me call you from the jail house.

"Q. You had not asked me before that time to use that defense, had you?

"A. No, I hadn't.

"Q. Do you have some history of mental problems?

"A. Yes, I do.

"Q. Would you describe those to the Court?

"A. The only time I got this, I was involved in a car accident and they say—I do not know—I was found unconscious in the middle of the street. They said I was involved in a car wreck. To the present day I do not know, but I was found guilty for concealed weapon, because the weapon in the car did not belong to me.

"Q. Would it be a fair statement that the charge in Federal Court is possession of a firearm in interstate commerce while convicted of a felony?

"A. Yes, I have the records.

"Q. Concerning that charge?

"A. Yes. Also at this time the Federal Government intended to send me to a hospital, but they had me in a treatment center. I had to take a urine test three times—well, at one time six times a week, and then three times a week. In fact, I was blacking out. Five doctors said I had a brain tumor,

and two doctors said I had sinus trouble. I don't know what it was.

"Q. Headaches was the symptom, correct?

"A. Yes.

"Q. It wasn't bizarre behavior that you had? It was blackouts and headaches, right?

"A. Yes. I would lose memory about things that would happen. They said I would do things, and I didn't have no remembrance of them. At the time I was on trial on federal charges I got sick, and they had to stop the trial, and I had to go back to the hospital.

"Q. You mean because of your problems with headaches and—

"A. Yes. I was doing time at the time this charge was filed on me. I was under two doctors' care during the time this charge was filed on the 13th, I was under two different doctors' care. Both of them referred me to a psychiatrist for mental health. He was not able to continue the treatment, because I was placed in jail and could not continue to see the doctor for the treatments I was getting. The Federal Government, in case I got convicted, was planning to send me to a hospital—they don't say what hospital, but send me to a hospital—to get further treatments. They knew I was having problems, but didn't know what was causing them. I thought I knew. I think it happened when I was in Leavenworth. I started having blackout spells. For three years I have been sick, been going to doctors in Columbia, Missouri, and in Kansas City, Missouri. One time, of course, I tried to kill myself. I got medical records to prove what I'm saying. When I tried to notify my attorney to get the records, I couldn't call him from the jail.

"Q. Those aren't the records you showed me this morning, are they?

"A. There are a few of them where I was going for treatment.

"Q. Where are the other medical records?

"A. One was at Doctor Spence's office.

"Q. Where does he have an office?

"A. 72nd and Troost.

"Q. What kind of office does he have?

"A. Just an office. Don't know the name. He was the one referred me to a psychiatrist. He sent me to another doctor. Don't remember his name. I got the names out in my file. He was at a clinic on Linwood and Park. My wife's out there. She was with me every time I went to the office. When I tried to kill myself, she come to see me at the hospital. I stayed out there, I think, nine or ten days, and my other attorney on the federal case got me out. Before this here I was going to try to get committed to Fulton. They was going to send me to St. Joe to get my mental examination, but I never did know what my problem was. I knew I just kept blacking out. And they said I did do things, and I never could remember.

"Q. When you say your wife, you're referring to Dorothy Lowry?

"A. Right. We're not legally married, but we got eight kids. I got three kids, and there's five that's not mine.

"Q. That's what you mean when you say your wife? You have been living together as man and wife?

"A. Right. We been planning to get married. Haven't had a chance to. It's a common law marriage. I do know my mother has been trying to get me to the hospital. I was out of my head. I don't really know . . . Like I say, a lot of things that's happened in the last year, I don't know. I know I need help, but when I try to ask someone for help, I don't get the kind of help I thought I needed. I don't think I need a psychiatrist, but then everybody tells me when I go to see a doctor I had to spend—my wife, girlfriend, she spent the money to get a doctor for me to go see. I know I needed help, but I don't know. I'm asking for it again. If I don't get it, I just don't get it. There's a lot of things that I have did. I thought I wasn't responsible for a lot of my actions. But I guess it happened. They tell me it happened. Like I say, the car wreck I had, I

couldn't tell you where it happened, what car they say I hit, where they found me. Like I say, the federal jail they tried to revoke my fine because they said I was under the influence of drugs, which I had been. Don't know if they caused the sickness I had or what. My records will show I went for about two or three months, because I was going every week. My wife had to drive me to the place, because I don't own a car. I had to take a urine test three times a week. At first it was six times. Every time my urine would come up it would be dirty with drugs.

"Q. Basically, what you're saying for the Court's—perhaps the Court will want to ask questions too—the symptoms you noticed were blackouts and headaches?

"A. Yes.

"MR. JOHNSON: I have nothing further, Your Honor.

"COURT: Do you have any further statements?

"A. I do need some help. Even if I get convicted or whatever, I still think before I get sentenced to the penitentiary—I know I'll never get back out again if I get sentenced. I feel like I might get sentenced, I think if a doctor got a chance he might have a chance to correct it. Maybe. If there's not permanent damage to my head or whatever. I don't know.

\* \* \* \* \* \*

"DEFENDANT: I have one thing to say. I'm not trying to delay the trial. I'll agree to go up on a lie detector test or truth serum test or whatever. I would agree to wait until the trial is over with. If I get convicted or whatever. If you send me to have examination, the thing I'm saying, I have records to back up what I'm saying. I even have a federal judge to back up what I'm saying. I'm not trying to delay the trial today. I'm willing to wait until afterwards, whatever you say. My agreement would be to . . .

\* \* \* \* \* \*

"DEFENDANT: I do believe I do have [a mental defect]. I'm not a lawyer. I tried to bring everything out to my lawyer, everything I thought was best to bring up. I have records to prove what I'm saying. I do know I have a problem, but what it is I don't know. I know I need help. I'm not a doctor either, to say I have to rely on people to speak in my behalf, to tell you the same thing I'm saying. If done, I'm not responsible for what I've done. I don't believe I did it. I know I didn't do it, but they say I did do it.

"COURT: There's one thing I want to make sure. As I understand you, you say Thursday of last week was when you first wanted to bring this to the attention of your lawyer, is that correct?

"A. Yes. I tried to get him to get the records at Western Mental Health Hospital where I was, but not when I was trying to get myself off drugs.

"COURT: And that's the time you refer to when the Adair County officers would not let you use the telephone, but you did get mail to your attorney on Saturday?

"A. I was just lucky enough to do it. Because it takes two days for mail to get to Kansas City from here.

"MR. JOHNSON: That's the Saturday preceding this Monday.

"A. Yes, this last Saturday.

"COURT: How long has it been since you've seen a doctor?

"A. I had to have one there almost every other week. I can't breathe. I didn't get no fresh air or exercise. My nose is stopped up. I constantly have headaches. I tell the doctors, but they don't give me what I need. I'm afraid I'll pass out. I know I'll pass out. I'm afraid I'll fall and hit my head or something and fall and kill myself. You know. I did the same thing when I was in federal court.

"COURT: Did you tell me you have or have not seen a doctor since you've been in Kirksville?

"A. Yes, I did.

"COURT: Who was he?

"A. They said the community doctor. Down here I couldn't get the medication I

needed, because you have to pay for it. Because I didn't have no money. In Kansas City you don't have to pay for it they told me. I tried to do the best I could with what I could.

"COURT: Mr. Johnson, anything further?

"MR. JOHNSON: You had an appointment following that accident in July of 1977 to have an EEG done, did you not?

"A. Yes, I did.

"Q. Was that EEG ever done?

"A. Not to my knowledge, it wasn't. There was some tests done, but . . .

"MR. JOHNSON: Does the medical record you showed me indicate—does it have a stamp on it that says that as far as the—I understand some times these things can be self-serving—but as far as the medical records you refer to, it says you failed to keep your appointment for the EEG. Is that what the medical record says that we went over this morning?

"A. Yes. Also the records, I tried to get you to bring them down here so the Judge could see for himself. At the time I got this Judge here I was supposed to see a psychiatrist at this clinic. He told me I needed to see him badly. He talked to me and told me the medication the other doctor had gave me and referred me to him. I couldn't get to him, and he couldn't come to the jail.

"MR. JOHNSON: For the record, I would state I happen to go into my office to pick up various supplies I needed for this proceeding on Saturday afternoon, including some note pads and pens. I had the file at home. And I ran across the letter, and by that time it was three thirty or four. I did make a call to Western Missouri to see whether or not I could locate the records. At that time they said I would have to call bookkeeping on Monday morning. I talked to Mr. Haley this morning about the medical records he had. He has advanced this motion in good faith. I can present no argument in behalf of it. However, in the event there should be a conviction it would be my intention to request an evaluation in aid of sentencing.

"A. I have one person if she is allowed to speak in my behalf. My wife. My mother is very sick. She wasn't able to come to the trial. That's why she isn't here. She has been trying to get me to go to the hospital, and I was going to go, but like I say . . .

"COURT: Could your wife tell me anything you haven't told me about your treatment? She would tell me the same thing—

"A. Yes. That I had a drug problem.

"COURT: The Court is going to deny the motion. It's not only untimely, but it is grossly untimely, and there's nothing in the statute requiring it. After sentencing, in aid of sentencing, I will be happy to hear you.

"A. Even if I'm found not guilty, could I still get something from you to get to the hospital?

"COURT: I would have no jurisdiction. If you're found not guilty, as far as my court is concerned you're a free man.

"A. Thank you."

■ At the pre-trial presentation to the judge of this matter, appellant's counsel presented it as involving a defense of mental illness or temporary insanity. The general thrust of appellant's complaints—blackouts, headaches, loss of memory, etc.—was so directed. Nowhere did appellant complain of inability to understand the proceedings or to cooperate with his attorney. The trial court viewed the matter as it was presented and correctly decided that the attempt to raise the defense of mental illness was untimely. § 552.030, RSMo 1978. *State v. Sears*, 501 S.W.2d 491, 492[1, 2] (Mo.App.1973); *State v. Holmes*, 439 S.W.2d 518, 520[2–4] (Mo.1969).

By his post-trial motion, appellant also injected the issue of fitness to proceed and his contention in this Court rests solely upon that basis. The question on appeal thus becomes whether or not the information given by appellant at the pre-trial conference was such that the trial court, sua sponte, should have ordered an examination

to determine appellant's fitness to stand trial. See *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *State v. Clark,* 546 S.W.2d 455, 467–468[14–16] (Mo.App.1977); *State v. Lasiter,* 562 S.W.2d 751, 755[4] (Mo. App.1978). Unlike *Pate* and *Drope,* there were no trial incidents which appellant claims might have given rise to reasonable grounds to cause the trial court to question appellant's fitness to proceed, and his contention rests solely upon the content of the pre-trial conference.

"The test of a criminal defendant's competency to stand trial is whether he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Stroder v. State,* 522 S.W.2d 77, 82[15] (Mo.App.1975)." *Lasiter,* 562 S.W.2d 754–755[3].

■ Should the appellant's remarks have given the trial court "reasonable cause" to believe that appellant was unable to consult with his attorney or to understand the proceedings? Appellant voiced no such complaint nor did his attorney. The remote, unspecific complaints of emotional or psychiatric disturbances did not compel a hearing on competency to stand trial (*State v. Jennings,* 555 S.W.2d 366, 368[4–6] (Mo. App.1977)); nor did the suicide attempt, not temporally related to the trial. *Jennings.* Apparently appellant had been seen at the Western Mental Health Center on some basis, but he did not state that he had been committed to that institution. He made no complaint that the blackouts and loss of memory which he suffered precluded his presentation of a defense to the charges against him. He testified at length to an alibi defense. When a problem arose with respect to the attendance of a witness who would support his defense, defendant replied rationally and understandingly to questions seeking his approval of a stipulation as to the witness's testimony.

The necessary conclusion is that nothing in appellant's statements or in his behavior at trial was sufficient to give the trial court reasonable grounds to question his ability to stand trial and the trial court did not err in failing to require a psychiatric examination of appellant in that regard.

Appellant's brief would equate his situation with that of *Drope.* In *Drope,* the defendant's bizarre behavior persisted at the time of his trial, including an attempt, the night before the trial began, to kill his wife (Drope was charged with others for raping his wife and his wife's reluctance to prosecute was overcome by his attempt to kill her.). Drope attempted suicide after the second day of his trial and was thereafter not present at the trial, thus depriving the trial court of opportunity "to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him." 420 U.S. 181, 95 S.Ct. 908. Here the defendant was present throughout the trial and the trial court had ample opportunity to observe his demeanor.

Appellant's situation is not comparable with that of Drope and *Drope* is not controlling of this case.

A firearm expert testified concerning two spent slugs which had been removed from pillows found at the scene of the assault. He explained why the bullets failed to penetrate the pillows completely. He was then asked whether or not he had with him in court a bullet which had been removed from the female victim. Defense counsel objected. "It's not in evidence. It refers to a matter not in evidence." The objection was overruled and, without further objection, the witness testified that a bullet removed from the victim and the two recovered from the pillows had been fired from the same weapon. In this Court, appellant contends that there was no foundation laid showing the relevance of the unmarked bullet claimed to have been removed from the victim and that to permit the witness to compare that bullet with the two introduced in evidence denied appellant a fair trial.

Appellant's only objection at trial was to the preliminary question about the witness's possession of the bullet in question. The preliminary question was not improper and the trial court overruled the objection which had been made. No objection was made to the subsequent testimony of the witness which is really the subject of the complaint here. This is not a case where the original ruling was such that counsel could have anticipated that further objection would be unavailing. Having failed to object to the testimony at trial, appellant will not be heard to complain of it on appeal.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by Welborn, C., is adopted as the opinion of the court.

All of the Judges concur.