**STATE of Missouri, Respondent,**

v.

**Samuel Lee McDONALD, Appellant.**

**No. 64057.**

Supreme Court of Missouri,
En Banc.

Nov. 22, 1983.

Rehearing Denied Dec. 20, 1983.

**498**

Henry Robertson, Asst. Public Defender, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Samuel Lee McDonald was jury-tried and convicted of the capital murder of Robert Jordan, an off-duty St. Louis County police officer, during the course of a robbery. The jury further found that the defendant committed the murder "for the purpose of receiving money or any other thing of monetary value by taking [Jordan's] wallet" and fixed his punishment at death. The death sentence was duly imposed. We affirm.

■ Defendant contends the substantial evidence was insufficient to support his conviction. In ruling this issue, we consider the facts in evidence and all favorable inferences reasonably to be drawn therefrom in the light most favorable to the jury's verdict and disregard all contrary evidence and inferences. *State v. Franco,* 544 S.W.2d 533 (Mo. banc 1977), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).

On the evening of May 16, 1981, Robert Jordan, accompanied by his 11-year-old daughter, Rochelle, went to the Forest Package Liquor Store to purchase snacks for his family for the weekend. He was wearing civilian clothes and in accordance with departmental policy was carrying his police revolver, concealed. Father and daughter arrived at the store about 11:00 p.m., and after making purchases they started out of the store.

Defendant and Jacqueline Blue had been driving around in a car for several hours and at around 11:00 p.m., defendant parked the vehicle a short distance away from the Forest Package Liquor Store. Defendant told his companion he would be right back and shortly thereafter was seen standing on the street corner next to the liquor store.

As Jordan and his daughter emerged from the store with their groceries, defend-

ant drew a pistol and accosted Jordan, firing one or more shots in the process. One of these shots wounded the officer in his chest and left arm and he fell to his knees. As the defendant stood with his pistol over the kneeling Jordan, Jordan handed him his wallet which contained his police badge. After receiving the wallet defendant began to turn away and then turned back and shot the officer again. The second bullet entered the left side of Jordan's chest, penetrated his heart and lodged in his stomach wall. As defendant attempted to flee, the mortally-wounded officer drew his service revolver and fired several shots at defendant, striking him three times. Jordan stumbled back into the store and asked that the police be called. He died before or shortly after an ambulance arrived.

Rochelle Jordan ran back into the store after her father was shot the first time and she testified at trial as an eyewitness to her father's execution. The robbery and shooting was also described at trial by two additional identification eyewitnesses, one viewing events from inside the liquor store and the other from across the street.

Defendant crawled back to the car and instructed Blue to drive him to the hospital. En route defendant changed his mind and told Blue to take him to a friend's house. Blue drove to the house and found no one home. Defendant removed the shirt he was wearing and stuffed it down a sewer drain. After unsuccessfully attempting to locate friends for medical aid, defendant had Blue drive him to the Veteran's Hospital. The parked car was later searched by police with Blue's consent. Jordan's wallet with the police badge was found in the rear seat. Defendant's clothing was found in the trunk, where he had told Blue to put it. The pocket of his black leather jacket contained a gun with four fired shell casings. A blood-soaked shirt was retrieved from the sewer where Blue said it had been discarded.

From the foregoing, the jury could find, beyond a reasonable doubt, that defendant killed Jordan while engaged in robbing him.

Defendant further argues that his conviction of capital murder cannot stand because the evidence does not establish the essential element of "deliberation." We disagree.

■ A deliberate act is one performed in a cool and deliberate state of mind. *State v. LaRette,* 648 S.W.2d 96, 102 (Mo. banc 1983); *State v. Craig,* 642 S.W.2d 98, 101–02 (Mo. banc 1982); *State v. Strickland,* 609 S.W.2d 392, 394 (Mo. banc 1980). No particular time is required to permit a finding of deliberation. The time may be very brief. *State v. Wood,* 596 S.W.2d 394, 400 (Mo. banc 1980); *State v. Hatfield,* 465 S.W.2d 468, 471 (Mo.1971).

■ On the record before us, the jury could reasonably find defendant intended to take the life of Officer Jordan and acted with the necessary premeditation and deliberation. Defendant was armed with a gun and seen standing near the liquor store minutes prior to the fatal shooting. The jury could reasonably find the entire course of defendant's conduct a product of deliberation. Further, the fatal shot was not fired immediately after Jordan surrendered his wallet. Defendant started to turn away, then turned back, and inflicted the mortal wound. The requisite deliberation could have occurred at this time and the jury could have so found.

The defendant raises numerous points on appeal, some related to the guilty-innocence phase of the trial, and some applying only to the sentence.

Defendant complains that the trial court erred in denying him a mental examination pursuant to § 552.030, RSMo (Cum.Supp. 1982).

■ Subsection 2 of § 552.030 provides that a defendant is not entitled to an examination unless he either files a guilty plea of "not guilty by reason of mental disease or defect excluding responsibility," or unless he files a written notice of his purpose to rely on such defense in a timely manner. Defendant's theory was that he was entitled to a *confidential* psychiatric examination *before* deciding whether or not to invoke a defense of mental disease or defect.

Defendant did not enter such a plea or give the statutory notice. The trial court cannot be faulted for following the statute and denying the requested examination. *State v. Ingram,* 607 S.W.2d 438, 440–41 (Mo. 1980); *State ex rel. Jordon v. Mehan,* 597 S.W.2d 724 (Mo.App.1980).

Defendant alleges several claims of trial error. In ruling on these points we take account of the very strong evidence that the defendant was guilty of the homicide.

■ During voir dire the trial judge asked members of the victim's family to stand so that the jury could recognize them and avoid contact with them. We find no prejudice in this. When the defense counsel later protested this action, the judge made a similar request of the defendant's family. These actions were properly within the duty and discretion of the trial court to take appropriate steps to prevent improper external influences upon jurors and potential jurors.

■ Defendant also alleges prejudicial error in allowing the victim's widow, Emma Jordan, to testify and to remain in the courtroom thereafter. She explained her husband's purpose in going to the store and for his carrying his concealed service revolver and identified her husband's keys, gun, wallet and badge. She then testified about her trip to the store after the shooting. Mrs. Jordan's testimony was relevant and there is no evidence in the record that Mrs. Jordan's continued presence at trial prejudiced the defendant. The point is without merit.

■ Defendant's complaint of prejudice in the trial court judge using his own judgment in checking on a disturbance and insisting that defense counsel not set up exhibits blocking his view of the defendant is equally without merit. Nor was there any prejudice in the court's inquiring as to whether a defense witness called to impeach Jacqueline Blue on account of her alleged drug addiction and treatment had violated confidences.

■ Defendant claims the trial court improperly allowed Jacqueline Blue's credibility to be bolstered by allowing reference to her prior consistent statements. Blue's testimony was strongly corroborated by other evidence at trial and proof of defendant's guilt was overwhelming. We find no prejudicial error.

■ We have carefully reviewed defendant's averments of improper argument by the prosecutor in the guilt phase of the trial. We note that (1) no objection was made to the complained of argument and (2) the prosecutor's remarks were in retaliation to defendant's argument. We find no error, plain or otherwise, and deny the point.

Defendant avers that the death penalty should be set aside on the basis that the particular aggravating circumstance was not authorized. This conclusion is arrived at by a narrow and restrictive construction of § 565.012.2(4) which allows the death penalty upon a finding that the defendant committed the capital murder "for the purpose of receiving money or any other thing of monetary value."

Defendant argues that a murder committed in the course of a robbery can never meet the requisite statutory language of § 565.012.2(4) because the term "receive" is not synonymous with "taking" in that the former requires a two-party transaction. This analysis is based upon prior cases involving the crime of receiving stolen property. The conclusion reached by defendant in comparing the meaning of "receiving" in two unrelated statutory contexts is misleading.

The meaning of "receiving" in the context of a receiving stolen goods statute has been defined in light of the purpose of the statute and its common sense relation to larceny statutes. One object in punishing a person as a receiver of stolen goods is to prevent the real thief from disposing of the goods and thereby lessening the chances of detection. If he is the principal actor in the theft, the actual captor of the property, it is illogical and contradictory to say he has received it from another. *State v. Honig,* 78 Mo. 249 (1883). A second reason for holding that the thief cannot receive stolen goods from himself is that his action, capturing the goods, is already covered under the larceny statutes and it would be duplicative to again cover the act with the receiving stolen goods statute.[1] *See generally,* 136 A.L.R. 1087 (1942). In other statutory context, the term "receive" is not determinative of a two-party transaction requirement. In *United States v. Kelly,* 519 F.2d 251 (8th Cir.1975), the Court answered affirmative to the question of whether a felon who steals a firearm may be convicted of "receiving" a firearm under 18 U.S.C. App. § 1202(a)(1). The court held that "a felon who acquires a weapon by theft, receives that weapon within the meaning of § 1202(a)." *Id.* at 253.

■ The rationale for interpreting the word "receiving" to require a two-party transaction in a receiving stolen goods statute is not present in the case of interpreting "receiving" in the context of § 565.012.2(4). The result is that the plain meaning of the term "receiving"[2] in § 565.012.2(4) should be given effect. *See, State v. Kraus,* 530 S.W.2d 684, 685 (Mo. banc 1975).

In Georgia, prior cases holding that the term "receive" within the context of a receiving stolen property context necessitated a two-party transaction[3] were not determinative in construing the term in the state's death penalty statute. Ga. § 27–2534.-1(b)(4) provides that if a murder is committed "for the purpose of receiving money or

---

**1.** "[T]he taking and receiving, being but a single transaction, constitute, of course, only one crime." *Milanovich v. United States,* 365 U.S. 551, 559, 81 S.Ct. 728, 732, 5 L.Ed.2d 773 (1961) (J. Frankfurter, dissenting).

**2.** Webster's defines receive as "*to take possession* or delivery of". Webster's Third New International Dictionary, Unabridged, 1894 (1981).

**3.** *Clark v. State,* 144 Ga.App. 69, 240 S.E.2d 270, 271 (1977); *Wells v. State,* 127 Ga.App. 109, 192 S.E.2d 567, 568 (1972); *Austin v. State,* 89 Ga.App. 866, 81 S.E.2d 508, 510 (1954).

any other thing of monetary value," the death penalty may be imposed. This language mirrors that of § 565.012.2(4), RSMo. In *Pulliam v. State,* 236 Ga. 460, 224 S.E.2d 8, *cert. denied,* 428 U.S. 911, 96 S.Ct. 3225, 49 L.Ed.2d 1219, *reh'g denied,* 429 U.S. 874, 97 S.Ct. 196, 50 L.Ed.2d 158 (1976), the Court held that a murder committed in the course of a $16.00 robbery was "for the purpose of receiving money and other things of monetary value." 224 S.E.2d at 13.

Defendant argues that it would be improper to construe the "receiving money" aggravating circumstance to impose the death penalty in a situation where the legislature did not so intend. Defendant points to cases in Nebraska and Oklahoma as support for refusing to interpret this type of aggravating circumstance to cover robbery. Defendant's attempt to limit § 565.012.2(4) to the *hired gun* situation is not warranted by a review of cases in other states.

Thirty-three states have death penalty statutes[4] which contain aggravating circumstance provisions which clearly are applicable to the hired gun situation. Defendant's position lumps all state aggravating circumstance statutes together as homogeneous. The precedential value of other state cases should be considered only in light of the varying language of those statutes.

The 33 states with hired gun aggravating circumstance statutes can be divided into four types. The first group of statutes are those similar to Missouri's and cover "receiving money". The Missouri language is identical to statutes in Georgia, Kentucky, Nevada, South Carolina and South Dakota.[5]

The most common statute provides for murder committed "for pecuniary gain." This second type of statute is found in ten states.[6] A third category of statutes cover murder "committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration." The remuneration statute exists in four states.[7] A fourth and final category is a catchall group of statutes which explicitly provide that the aggravating circumstance is limited to the hired gun situation in no uncertain terms. Eleven statutes fall into this category[8]. Typical of this group is Ind.Code Ann., § 35–50–2–9 (Burns 1979), stating "The defendant who committed the murder was hired to kill," and "The defendant committed the murder by hiring another person to kill."

Obviously, states with statutes falling into the fourth category provide no insight into whether the Missouri statute, a category one statute, should be applied to a robbery situation. Likewise, category three states are of little help. "Remuneration", plainly implies payment from one person to another in compensation for services.[9] Despite this great dissimilarity between the Missouri statute and the remuneration statutes, defendant places great reliance on an Oklahoma case which interpreted that state's *remuneration* statute and held it inapplicable in a robbery murder case. The holding in *Boutwell v. State,* 659 P.2d 322, 329 (Okl.Cr.1983), is hardly surprising. However, even in *Boutwell,* the Court noted that other states had statutes which would be broad enough to be applicable in a robbery context. 659 P.2d at 329.

---

**4.** See Appendix.

**5.** "The offender committed the offense of capital murder for himself or another, for the purpose of receiving money or any other thing of monetary value." § 565.012.2(4), RSMo. *See also,* Ga.Code Ann. § 27–2534.1(b)(4) (1983); Ky.Rev.Stat.Ann. § 532.025(2)(a)(4) (Cum. Supp.1983); Nev.Rev.Stat. § 200.033(6) (1981); S.C.Code Ann., § 16–3–20(a)(4) (Law Co-op Cum.Supp.1982); and S.D.Codified Laws Ann. § 23A–27A–1. (Supp.1983). *Compare,* La.Rev. Stat.Ann. § 14:30 (West 1983).

**6.** Ala., Ariz., Ark., Del., Fla., Miss., N.C., N.H., Utah, Wyo.. *See also,* Cal. "financial gain".

**7.** Idaho, Okla., Tenn., Tx..

**8.** Conn., Ill., Ind., Md., Mass., Neb., N.J., Ohio, Pa., Va., Wash..

**9.** 1. to pay an equivalent for (as a service loss, expense) 2. to pay an equivalent to (a person) for a service, loss or expense. Webster's Third New International Dictionary, Unabridged, (1981).

Cases construing pecuniary gain statutes are important only in the sense that they are free from the restrictive language of category three remuneration and category four explicit hired gun statutes. Indeed, defendant takes great stock in the holding in *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874, *cert. denied,* 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198, *reh'g. denied,* 434 U.S. 988, 98 S.Ct. 622, 54 L.Ed.2d 485 (1977), which found that the Nebraska *pecuniary gain* statute did not apply to a murder committed in the course of a robbery. However, the *Rust* holding is clearly a minority view among states with pecuniary gain statutes.[10]

In *State v. Irwin,* 304 N.C. 93, 282 S.E.2d 439, 448 (1981), the North Carolina Supreme Court stated that "the aggravating circumstance of pecuniary gain will almost always be appropriately submitted to the jury where a murder is committed during the course of an armed robbery." In *State v. Oliver,* 302 N.C. 28, 274 S.E.2d 183 (1981), the court again reiterated its position and commented on its prior holding in *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1971):

> In *Cherry,* the murder was committed during the course of the robbery of a convenience store. The aggravating circumstance of 'pecuniary gain' was submitted and answered by the jury against the defendant. Although we remanded the case for a new sentencing hearing, we

did not suggest in *Cherry* that this particular aggravating circumstance should not be submitted at the new hearing. *We reject the position taken by the Nebraska Court that this aggravating circumstance does not apply to a murder committed during a robbery. See, State v. Rust,* 197 Neb. 258, 250 N.W.2d 867 (1971). This aggravating circumstance, we hold, was properly submitted to the jury in both murder cases.

274 S.E.2d at 204–05. (Emphasis added).

In *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430 (1980), the Arkansas Supreme Court held that the aggravating circumstance of pecuniary gain was "not limited to a killing for hire, but is also clearly applicable to a murder committed during a robbery." *Id.* at 440. *See also, Giles v. State,* 261 Ark. 413, 549 S.W.2d 479, 483–84 (1977); *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, 122 (1977). In *Neal v. State,* 270 Ark. 442, 605 S.W.2d 421 (1980), the court rejected defendant's argument that the statutory meaning of "pecuniary" or "motive" was unconstitutionally vague in light of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Id.* at 424, 100 S.Ct. at 1763. In *Neal,* the pecuniary gain aggravating circumstance was held proper in a murder committed in the course of a service station robbery.

Pecuniary gain statutes in Arizona [11], Mississippi [12], Florida [13] and Maine [14] have

---

**10.** Alabama is the only other state to take this position. *See, Ashlock v. State,* 367 So.2d 560 (Ala.Cr.App.1978).

**11.** *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, 8–9 (1983); *State v. Poland,* 132 Ariz. 269, 645 P.2d 784, 800–01 (1982); *State v. Blazak,* 131 Ariz. 598, 643 P.2d 694, 701 (1981); *State v. Clark,* 126 Ariz. 428, 616 P.2d 888, 896, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

**12.** *See Tokman v. State,* 435 So.2d 664 (Miss. 1983); *Hill v. State,* 432 So.2d 427, 443 (Miss. 1983); *Smith v. State,* 419 So.2d 563, 568 (Miss.1982).

**13.** *See Raulerson v. State,* 420 So.2d 567, 571 (Fla.1982); *Provence v. State,* 337 So.2d 783, 786 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977); *See also, Menendez v. State,* 419 So.2d 312, 315 (Fla.

1982); *White v. State,* 403 So.2d 331, 337–38 (Fla.1981); *Peek v. State,* 395 So.2d 492, 499 (Fla.1980), *cert. denied,* 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981).

**14.** Maine does not have a capital punishment statute. However, the statute provides that a person is guilty of criminal homicide in the first degree if he commits criminal homicide in the second degree and the jury finds one or more statutory aggravating circumstances. Me.Rev. Stat.Ann. tit. 17–A, § 201 (1975). In *State v. Snow,* 383 A.2d 1385 (Me.1978), the Maine Supreme Court rejected the defendant's claim that the "pecuniary benefit" aggravating circumstance referred only to a hired killing or one who kills for insurance proceeds. In *Snow,* pecuniary benefit was held to apply to a murder committed during a robbery. The court explicitly rejected the holding reached by the Nebraska court in *Rust* and stated: "[I]t sub-

also been held to apply to murders committed during robberies and other property crimes.

Five states have statutes which use the identical language as that in § 565.012.2(4). The cases from these states are the most persuasive. As previously noted, in *Pulliam v. State,* Georgia held the statute applicable to a murder committed for robbery. This conclusion was reached despite earlier Georgia cases interpreting the state's receiving stolen property statute to require a two-party transaction. In *State v. Woomer,* 277 S.C. 170, 284 S.E.2d 357 (1981), the defendant stole the victim's coin collection and clothes, marched him into a back room and shot him to death. The court held that the trial court properly found that the defendant committed the murder for the purpose of receiving money or anything of monetary value. 284 S.E.2d at 358–59.[15] The other three states have not addressed the instant issue.[16]

Defendant also argues that if the legislature had intended to include murder committed in the course of robbery as an aggravating circumstance it should have explicitly done so as have other states. This argument ignores the fact that five states that do have a separate statute covering robbery as an aggravating circumstance have nevertheless held pecuniary gain or receiving money statutes to also be proper instructions in robbery-murder cases. In Missouri, the application of the receiving money statute to murder in the course of robbery

would not be duplicative of an existing aggravating circumstance and is thus even more reasonable.[17]

Defendant's argument ignores the cases in Arkansas which have held that the Arkansas pecuniary gain statute is applicable to murders committed in the course of robbery. Arkansas, like Missouri, has no specific aggravating circumstance statute separately specifying robbery.

In *State v. Stokes,* 638 S.W.2d 715 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983), the defendant's taking the victim's automobile, man's watch and pendant watch was sufficient to authorize submission of the same aggravating circumstance submitted in this case. In the instant killing, defendant fatally shot Officer Jordan in the course of robbing him of his wallet. We conclude, therefore, that the aggravating circumstance of § 565.012.2(4) was properly submitted and supported by substantial evidence.

Defendant next avers the trial court erred in failing to sustain objections to several alleged prejudicial remarks made by the prosecutor during the penalty stage of the trial. Defendant claims the prosecutor made reference to unadmitted photographs, improperly remarked on the victim's character, alleged deterrent effects of the death penalty unsupported by the evidence, improperly argued society's right to defend itself, remarked that a life sentence could be reduced by legislative or executive ac-

---

verts the plain meaning of the words to require, as the defendant would have us do, that death be some kind of legal condition precedent to obtaining the pecuniary benefit. The construction we reach has been the view of a majority of courts which have construed similar language." *Id.* at 1388.

**15.** The court also said it was proper to submit two other aggravating circumstances; (1) robbery while armed with a deadly weapon, and (2) larceny with a deadly weapon. *Id.* at 358.

**16.** In Nevada, the state supreme court declined to address the issue in a recent case upon finding the facts also fit the "hired gun" situation. *Wilson v. State,* 664 P.2d 328, 337 (Nev. 1983).

**17.** *It is important to note that Missouri has a separate aggravating circumstance to cover the hired gun killing. Section 556.012.2(6).* Any statutory construction seeking to minimize duplication and overlap of aggravating circumstances would attempt to give different effect to § 565.012.2(4) and (6). The construction urged by the defendant practically makes (4), the receiving money circumstance, a subset of (6), the explicit hired gun statute. The only unique situation covered by (4) would be killing for inheritance and insurance proceeds. It is very doubtful that the legislature intended this to be the limited purpose of (4). However, by construing (4) to apply to murders committed during robbery, an independent purpose and logical effect is given to § 565.012.2(4).

tion, and any sentence in the instant case would be subjected to repeated review.

 In reviewing the record we are cognizant that broad discretion rests with the trial court to control closing argument, with wide latitude accorded counsel in their summaries. *State v. Gilbert,* 636 S.W.2d 940, 943 (Mo. banc 1982); *State v. Olds,* 603 S.W.2d 501, 511 (Mo. banc 1980). A trial court's discretion in allowing or rejecting argument of counsel and its ruling are reversible only for an abuse of discretion where the argument is plainly unwarranted. *State v. Armbruster,* 641 S.W.2d 763, 766 (Mo.1982). The prosecutor has the right to argue reasonable inferences from the evidence, and additionally, he has the right to draw any inference from the evidence which he believes in good faith to be justified. *Id.* at 766. *See also, State v. Brewer,* 565 S.W.2d 801 (Mo.App.1978); *State v. Burroughs,* 559 S.W.2d 42 (Mo.App. 1977). Further, in the penalty phase of a capital murder case both parties should be given wide latitude in arguing the matter of punishment. *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976).

 During argument the prosecutor made a single reference to pictures of the victim which were inside a manila folder at counsel's table. In overruling an objection to this comment the trial court noted that no attempt was made to remove or display the pictures to the jury. We find no abuse of discretion.

 The prosecutor's brief and cursory remarks that the victim, Officer Jordan, was a "real nice man" was supported by the evidence in the record. The prosecutor's argument regarding the deterrent purpose and propriety of the death penalty in the instant case were also supported by the evidence. Furthermore, we have long recognized that arguments on the deterrence of crime and the necessity of law enforce-

ment and the need for society to protect itself need not have support in evidence, and such pleas may call upon common experience. *State v. Newlon,* 627 S.W.2d 606, 619 (Mo. banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 *reh'g. denied,* —— U.S. ——, 103 S.Ct. 397, 74 L.Ed.2d 520 (1982); *State v. McKinney,* 475 S.W.2d 51, 55 (Mo.1971).

 References to clemency and legislative intervention in reducing sentences have been held to be improper in Missouri. *State v. Lewis,* 443 S.W.2d 186, 189–90 (Mo. 1969).[18] But where the remarks were short and a small part of the closing statement, we have deferred to the discretion of the trial court and found no reversible error. *State v. Murphy,* 592 S.W.2d 727, 732 (Mo. banc 1979); *State v. Sallee,* 436 S.W.2d 246 (Mo.1969). This court has similarly treated brief remarks regarding the possibility of sentence reviews as insufficient basis for reversal. *See, State v. Newlon,* 627 S.W.2d at 617–19.

We turn now to defendant's contention that the sentence of death in this case is excessive and disproportionate.

The General Assembly has mandated that this Court shall consider the matter of the death sentence being imposed and requires us to determine [§ 565.014.3, RSMo 1978]:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

 We find nothing in the record to suggest the sentence resulted from the in-

---

**18.** We observe that the recent case of *California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), 33 Cr.L. 3306, held the Constitution does not prohibit an instruction at the penalty stage of a capital case that informs the jury that a sentence of life imprisonment without the possibility of a parole may be commuted by the governor to a sentence that includes the possibility of a parole.

fluence of passion, prejudice, or any other arbitrary factor. There was substantial evidence to support the jury's finding of the statutory aggravating circumstance.

Finally, defendant argues the sentence of death in this case is excessive and disproportionate ["to the penalty imposed in similar cases, considering both the crime and the defendant."]

Here, the defendant's wounded victim was on his knees and handed his wallet over to defendant. The obvious inference from the evidence is that defendant spotted the officer's police badge in the wallet and then callously and brutally proceeded to execute the wounded officer. In the words of the experienced trial judge, the Honorable Daniel T. Tillman, in his report to this Court, the murder of Officer Jordan was a "Cold blooded assassination of [a] defenseless man." Or, as this Court observed in *State v. Newlon,* "This was a senseless killing, a killing for killing's sake." 627 S.W.2d at 622.

The jury found, beyond a reasonable doubt, the "threshold requirement", *i.e.,* the presence of the statutory aggravating circumstance, and then considered all the evidence and recommended the death sentence. After taking into account both the crime and the defendant, we conclude the penalty assessed is not excessive or disproportionate to the penalties imposed in similar cases. In arriving at this conclusion we have reviewed the cases decided since the enactment of our current capital murder statute, § 565.001. The cases include those where the death sentences were affirmed, one case which reversed the death sentence because of its disproportionality, and capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury.

The judgment is affirmed.

RENDLEN, C.J., and HIGGINS, GUNN and DONNELLY, JJ., concur.

HOUSER, Senior Judge, concurs in part and dissents in part in separate opinion filed.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed and concurs in the opinion of HOUSER, Senior Judge.

WELLIVER, J., not sitting.

Execution date set for January 6, 1984.

## APPENDIX

*Ala.Code § 13A–5–49 (1982 Replacement Vol.)*

(4) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of or, an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping;

(6) The capital offense was committed for pecuniary gain;

*Ariz.Rev.Stat.Ann. § 13–703.F (1978)*

4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, or anything of pecuniary value.

*Ark.Stat.Ann. 41–1303(6) (1977)*

(6) The capital murder was committed for pecuniary gain

*Cal.Penal Code § 190.2(a) (West Cum.Supp. 1983)*

(1) The murder was intentional and carried out for financial gain.

(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

(i) Robbery in violation of Section 211.

*Col.Rev.Stat. § 16–11–103 (1982 Cum. Supp.)*

Repealed by amendment L. 79, p. 673 § 1.

*Conn.Gen.Stat. § 53a–46a(g) (1983)*

(1) The defendant committed the offense during the commission or attempted com-

mission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony,"

(5) The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

*Del.Code Ann. tit. 11 § 4209(e) (1982 Cum. Supp.)*

(1)(h) The defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(1)(j) The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary.

(1)(*o*) The murder was committed for pecuniary gain.

*Fla.Stat.Ann. § 921.141(5) (West Cum. Supp.1983)*

(d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(f) The capital felony was committed for pecuniary gain.

*Ga.Code Ann. § 27–2534.1 (1983)*

(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony;

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree;

(3) The offender, by his act of murder, armed robbery or kidnapping, knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value;

*Idaho Code § 19–2515(f)(4) (1979)*

(f) The murder was committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration.

*Ill.Rev.Stat. Ch. 38, § 9–1(b) (Smith-Hurd Cum.Supp.1983)*

5. The defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder or procured another to commit the murder for money or anything of value; or

6. The murdered individual was killed in the course of another felony if:

(a) the murdered individual:

(i) was actually killed by the defendant, or

(ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable under Section 5–2 of this Code, and the

physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual; and

(b) in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual under the circumstances of subdivision (ii) of subparagraph (a) of paragraph (6) of subsection (b) of this Section, the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, aggravated arson, burglary, home invasion, indecent liberties with a child, or the attempt to commit any of the felonies listed in this subsection (c);

*Ind.Code Ann. § 35–50–2–9(b) (Burns 1979)*

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

*Ky.Rev.Stat.Ann. § 532.025(2)(a) (Bobbs-Merrill Cum.Supp.1983)*

(2) The offense of murder or kidnapping was committed while the offender was engaged in the commission of arson in the first degree, robbery in the first degree, burglary in the first degree, or rape in the first degree, or sodomy in the first degree.

(4) The offender committed the offense of murder for himself for another, for the purpose of receiving money or any other thing of monetary value, or for other profit.

*La.Rev.Stat.Ann. § 14:30 (West 1983)*

(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.

*Md.Ann.Code, art. 27, § 413(d) (1982)*

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

(10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree.

*Mass.Ann.Laws Ch. 279, § 69 (Michie/Law Co-op. Cum.Supp.1983)*

(a) In all cases in which the death penalty may be authorized, the statutory aggravating circumstances are:

(5) the murder was committed by the defendant pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder;

(10) the murder was committed by the defendant and occurred during the commission or attempted commission or flight after committing or flight after attempting to commit aggravated rape, rape, rape of a child, indecent assault and battery on a child under fourteen, assault with intent to rape, assault on a child under sixteen years of age with intent to rape, kidnapping for ransom, kidnapping, armed robbery, unarmed robbery, breaking and entering with intent to commit a felony, armed assault in a dwelling, arson, confining or putting in fear or otherwise harming another for the purpose of stealing from depositories, or the murder occurred while the defendant was in possession of a sawed-off shotgun or a machine gun.

*Miss.Code Ann. § 99–19–101(5) (Cum.Supp. 1982)*

(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after commit-

ting or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy or the unlawful use or detonation of a bomb or explosive device.

(f) The capital offense was committed for pecuniary gain.

*§ 565.012, RSMo 1982 Supp.*

2. Statutory aggravating circumstances shall be limited to the following:

(4) The offender committed the offense of capital murder for himself or another, for the purpose of receiving money or any other thing of monetary value;

(6) The offender caused or directed another to commit capital murder or committed capital murder as an agent or employee of another person;

*Mont.Code Ann. § 46–18–303 (1981)*

[No relevant aggravating circumstance.]

*Neb.Rev.Stat. § 29–2523(1) (1977)*

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

*Nev.Rev.Stat. § 200.033 (1981)*

(4) The murder was committed while the person was engaged, or was an accomplice, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary or kidnapping in the first degree;

(6) The murder was committed by a person, for himself or another, for the purpose of receiving money or any other thing of monetary value.

*N.H.Rev.Stat.Ann. § 630:5 II.(a) (Cum. Supp.1981)*

(6) The murder was committed for pecuniary gain.

*N.J.Stat.Ann. § 2C:11–3(c)(4) (1982)*

(d) The defendant committed the murder as consideration for the receipt, or in expectation of the receipt of any thing of pecuniary value;

(e) The defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value;

*N.C.Gen.Stat. § 15–A–2000(e) (Cum.Supp. 1981)*

(5) The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, rape, or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(6) The capital felony was committed for pecuniary gain.

*Ohio Rev.Code Ann. § 2929.04(A) (Baldwin Cum.Supp.1982)*

(2) The offense was committed for hire;

(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary . . . .

*Oklahoma Stat.Ann. tit. 21 § 701.12 (1983)*

(3) The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the purpose of remuneration.

*Pa.Cons.Stat.Ann. tit. 42 § 9711(d) (Purdon 1982)*

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(6) The defendant committed a killing while in the perpetration of a felony.

*R.I.Gen.Laws Ann. § 11–23–2 (1981)*

[No relevant aggravating circumstance.]

*S.C.Code Ann. § 16–3–20(C) (Law Co-op Cum.Supp.1982)*

(a) Aggravating circumstances:

(1) Murder was committed while in the commission of the following crimes or acts: (a) rape, (b) assault with intent to ravish, (c) kidnapping, (d) burglary, (e) robbery while armed with a deadly weapon, (f) larceny with use of a deadly weapon, (g) house-

breaking, and (h) killing by poison and (i) physical torture;

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value;

*S.D.Codified Laws Ann. § 23A–27A–1. (Supp.1983)*

(3) The defendant committed the offense for himself or another, for the purpose of receiving money or any other thing of monetary value;

(5) The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;

*Tenn.Code Ann. § 39–2–203(i) (1982)*

(4) The defendant committed the murder for remuneration or the purpose of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration.

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

*Tex.Penal Code Ann. § 19.03(a) (Vernon 1974)*

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson;

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration.

*Utah Code Ann. § 76–5–202(1) (1978)*

(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, forcible sodomy, or aggravated sexual assault, ag-

gravated arson, arson, aggravated burglary, burglary, aggravated kidnapping or kidnapping.

(f) The homicide was committed for pecuniary or other personal gain.

*Va.Code § 18.2–31 (Cum.Supp.1983)*

(b) The willful, deliberate and premeditated killing of any person by another for hire;

(d) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon.

*Vt.Stat.Ann. tit. 13 § 2303 (Cum.Supp.1983)*

[No relevant aggravating circumstance.]

*Wash.Rev.Code Ann. § 10.95.020 (Cum. Supp.1982)*

(4) The person committed the murder pursuant to an agreement that he or she would receive money or any other thing of value for committing the murder;

(5) The person solicited another person to commit the murder and had paid or had agreed to pay money or any other thing of value for committing the murder;

*Wyo.Stat. § 6–2–102(h) (Supp.1983)*

(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb.

(vi) The murder was committed for pecuniary gain.

NORWIN D. HOUSER, Senior Judge, concurring in part and dissenting in part.

Finding no merit in any of appellant's points seeking to overthrow his conviction, I concur in the analysis of those points made in the majority opinion. I respectfully dissent, however, from the final disposition of the case affirming the death penalty, for the reason that I find no evidence to support the conclusion that appellant killed

Robert Jordan for the purpose of receiving money.

The law allows the state to take the life of a person as the penalty for capital murder only in cases where one or more of the aggravating circumstances specified in RSMo § 565.012 exist. One of these circumstances is the situation in which the offender commits the offense of capital murder "for the purpose of receiving money or any other thing of monetary value." Section 565.012(4). This is the aggravating circumstance relied upon by the state in its attempt to justify the death sentence, but neither from the facts in evidence nor from the inferences which reasonably may be drawn therefrom may it confidently be said that the aggravating circumstance relied upon existed in this case. The facts do not fit the statute, and vice versa.

Under the evidence appellant commenced and completed the robbery, and received into his possession the fruits of the crime (the wallet containing money), before the fatal shot was fired. There is no question that at the time the fatal shot was fired appellant had already possessed himself of the money. It is clear that appellant fired the fatal shot not for the purpose of obtaining or "receiving" money, which he had just taken and obtained, but for other reasons. The most obvious inference is that appellant fired the fatal shot for the purpose of keeping, securing and retaining possession of money previously taken from his victim at gun point. Other reasonable inferences may be drawn from the facts on the question of appellant's purpose or motive in committing capital murder: (1) that when appellant opened the wallet, thereby revealing the police badge, appellant fired the fatal shot to eliminate an officer of the law as a potential witness against him should he be apprehended; (2) that appellant, realizing that a police officer in plain clothes might be carrying a service revolver, deliberately killed the officer to insure appellant's safe retreat and facilitate his escape from the scene of the robbery. (Before the fatal shot finally incapacitated him the officer produced his revolver and fired at appellant, inflicting three wounds upon him).

On this evidence, however, it is neither a reasonable nor a permissible inference, under any accepted definition of the term "receiving," that appellant fired the fatal shot for the purpose of receiving money.

In approving and endorsing that inference, and in interpreting § 565.012(4), the majority opinion fails to apply the well-established rule of construction mandating that in the application of § 565.012 to a particular set of facts the law requires the Court to construe the statute literally and strictly and not broadly and expansively. In its regard for the sanctity of human life, which is part and parcel of the American legacy, the courts, as guardian of that legacy, should not pull and stretch a penal statute beyond its plain and evident intent and purpose, or substitute an aggravating circumstance not prescribed by law, in order to attain what may be deemed substantial justice in a particularly revolting case.

Subsection four of § 565.012 was meant to apply to situations of which the following are typical examples: where a person murders or causes to be murdered an insured in a life insurance policy and the person causing the death is a named beneficiary in the policy or otherwise stands to gain financially from the death; where the maker of a will is murdered by or through the agency of a legatee, devisee or other person who would gain financially from the death.

Appellant's crime was a repulsive killing. The shot was fired in the presence of the victim's child, while the victim was down on his knees, kneeling before the gunman—an atrocious, shocking slaughter, performed in a pitiless, merciless manner. One recoils with horror on reading the record of this tragedy, but no matter how evil the act, an accused's life may not lawfully be forfeited for the deed *in the absence of a statutorily prescribed aggravating circumstance,* and there was none present in this case.

This was a killing *in the perpetration of a robbery.* By § 565.032.2(11), effective July 1, 1984, the General Assembly has provided that it is an aggravating circumstance authorizing the extreme penalty if murder in

the first degree was committed while the defendant was engaged in the perpetration of robbery, but this new law was not in force and effect at the time of this occurrence, and is not to be applied retroactively.

I concur in the affirmance of the conviction of capital murder. I dissent from the order of execution, and would remand the cause for resentencing under RSMo § 565.-014.5(2).

BLACKMAR, Judge, concurring in part and dissenting in part.

I concur in the affirmance of the conviction of capital murder. The trial itself was eminently fair and, after careful reflection, I conclude that the infirmities which I find in the proceedings dealing with mental examination do not require a new trial of the guilt-innocence phase.

The penalty phase, however, is seriously deficient in several respects, and the death sentence should not be allowed to stand. I believe that § 565.014, RSMo 1978, enjoins upon us a special responsibility in cases in which sentence of death has been pronounced, and that it is the sense of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and the cases decided concurrently that state courts at all levels should give detailed scrutiny to cases in which the ultimate penalty is a possibility.

The trial judge should be something more than a wrestling referee who may break an occasional illegal hold but generally leaves the combatants to their own devices. The question is not so much whether the trial judge is to be "faulted" or "convicted of error" as whether the defendant has had a trial in which all appropriate issues have been explored and the case properly submitted to the jury on the basis of full information.

Complaint has been made about the proliferation of post-conviction remedies, especially in death sentence cases. I am particularly impressed by Justice Sandra Day O'Connor's suggestion that the state Courts

are fully capable of discharging their constitutional responsibility in criminal trials.[1] We should accept this challenge and should take affirmative steps to make sure that the initial trial is full and fair, beyond criticism. We should take appropriate action to correct flaws in the procedure below when first we sense them rather than coming forth with holdings which actually court post-conviction review by glossing over serious deficiencies. Nor should we be too quick to look for omissions on the part of publicly financed defense counsel as occasion for declining judicial scrutiny of possibly serious errors.

### 1. The Mental Examination Issue

In line with the suggestions just made, I believe that this defendant was improperly refused a psychiatric examination.

The defendant is indigent and has been represented at all stages by the St. Louis Public Defender's office. He was arraigned on June 18, 1981 and entered a plea of not guilty. At no time was there a plea of "not guilty by reason of mental disease or defect."

Four days later the defendant filed a document entitled "motion for appointment of psychiatrist," and another entitled, "motion to permit late filing of defense of mental disease or defect excluding responsibility." This latter motion is anomalous. By the express language of § 552.030.2, RSMo 1978, a notice of intent to rely on a defense of mental disease or defect could have been filed, without leave of court, within ten days after arraignment.

The motion for appointment of a psychiatrist stated that the defense counsel was unable to advise her client as to whether a plea of mental disease or defect excluding responsibility should be made until a professional mental examination could be had and evaluated. The motion also contained the request that the results of the examination be available to the defendant alone unless and until such a plea should be entered.

1. O'Connor, "Trends in the Relationship Between the Federal and State Courts from the

Perspective of a State Judge," 22 Wm. & Mary L.R. 801 (1981).

There is no indication that the motion for leave was ever called up, brought to the court's attention, or ruled on. The first motion for appointment of a psychiatrist was overruled by Judge McGuire on July 1, 1981. There is nothing in the record as to the proceedings on this motion, other than the ruling, and no explanation of the court's reason for its action. It appears from later proceedings that the defendant had the opportunity to present evidence in support of this motion and presented none.

On July 20, 1981, a second motion seeking appointment of a psychiatrist was filed. This motion was similar to the previous one, but recited that the defendant had been less cooperative in dealings with his counsel than earlier. This motion was also overruled, on August 12, 1981, by Judge McGuire, without prejudice.

A third motion was filed January 25, 1982, before the judge who presided at the trial. This motion, for the first time, contained the statement that psychiatric evidence was needed for use at the penalty phase of the trial in the event of a conviction of capital murder. Counsel also adduced, during argument on the motion, the military records of the defendant, including a report of a suicide attempt in 1967 while in Vietnam. The court again overruled the motion, without taking note of the newly suggested need for psychiatric evidence, stating "that's been denied two times before," and commenting on the lack of supporting evidence.

A fourth motion was filed on February 16, 1982 just before trial began. Counsel, in response to the trial judge's question, stated that she was not relying on the defense of mental disease or defect excluding responsibility because, in the absence of psychiatric information, she had no basis for determining whether the defense had merit. Counsel also mentioned the importance of psychiatric information at the penalty phase of the trial. The motion was again denied and

the trial began forthwith without the indigent defendant's having had any psychiatric examination.

The state's justification for the court's failure to appoint a psychiatrist is purely procedural. It is asserted that § 552.030.4 gives no authority for such an examination unless the defendant either enters a plea of "not guilty by reason of mental disease or mental defect excluding responsibility," or files a notice of intent to rely on that defense, in accordance with § 552.030.2. The state goes on to argue that the filing of June 22, 1981 should not be treated as an appropriate notice, because it is cast in the form of a request for leave and was never called up as a motion or brought to the court's attention. The state's conclusion is that the defendant was not entitled to the examination because his counsel failed to take the required steps to obtain it.

The conduct of defense counsel is indeed puzzling. It is difficult to see how the defendant could possibly be harmed if notice of intent to rely on the mental defense were given. The notice could be withdrawn at any time, and, if withdrawn, would not prejudice the defendant in the subsequent proceedings. In contrast to the situation in civil cases, a criminal defendant is entitled to tender any recognized plea in order to lay the foundation for defense, and counsel does not vouch for the factual accuracy of the plea. So, by the simple expedient of making the appropriate plea or giving notice, defense counsel could have obtained the requested examination and could have had the benefit of the information it contained during both phases of the trial. Had the examination disclosed no mental problem there would be no prejudice.[2]

*State ex rel. Jordon v. Mehan,* 597 S.W.2d 724 (Mo.App.1980) rejected a claim for confidential treatment of the psychiatric information, holding that the sense of §§ 552.020 and 552.030 is that reports ordered pursuant to those sections are to be available to

---

**2.** If the prosecution received reports of any examination as provided in §§ 552.020, 552.030, RSMo 1978, and *State v. Carter,* 641 S.W.2d 54 (Mo. banc 1982), the information

could not be used to the defendant's disadvantage unless a claim of mental disease or defect was actually presented to the jury.

both parties. The court specifically rejected the claim that a defendant is entitled to a confidential evaluation in order to decide whether to use the mental defense, but recognized the defendant's problem and suggested the use of the public defender's funds, citing § 600.040 and § 600.150, RSMo 1978. The present motions cited these sections also, but the record is silent as to the availability of funds.

The entire responsibility for the absence of a psychiatric evaluation should not be placed on the defendant, or on his counsel. It would have been far better if one of the judges to whom the successive motions were presented had assumed a more active role when the motions were presented. The courts should lean over backwards to provide psychiatric evaluation for an indigent defendant held to answer capital charges. The court's powers under Chapter 552 are not so circumscribed as the state would have it. Section 552.020 clearly authorizes the court to act on its own motion. Even though that section deals with the determination of fitness to stand trial, the report of an examination is expressly required to include the examiner's conclusion as to the presence of a mental disease or defect excluding responsibility. Counsel's representations of problems of communication with the defendant, as contained in the second motion, suggest that an inquiry into capacity was imperative. It would have been far better if the responsible judge, at some time before trial, had called counsel before him to explore the entire matter of mental examination and the motions and papers on file. The intention behind the "request to permit late filing" could have been probed. If counsel stood on the request for confidential treatment, and said that she did not want the examination without this proviso, the record would at least be clarified, and inquiry might have been made as to the availability of funds under § 600.040 or § 600.150, as suggested by the Court of Appeals in *Jordon, supra.* A notice of intent in proper form might have been suggested. If counsel had some devious purpose in proceeding as she did, this too could

have been smoked out and appropriate action taken.

The trial judge suggested that the earlier motions had been denied because of "lack of evidence" to justify the examinations. It is the sense of the statutes that requests for examination should be freely granted on the basis of counsel's representations. There are, furthermore, circumstances suggesting that an examination was appropriate in this case. It is entirely proper for the prosecutor to argue to the jury that events 15 years ago in Vietnam are too remote to permit a conclusion as to the defendant's mental capacity, but a publicly appointed lawyer who is not trained in psychiatry would nevertheless be concerned about the defendant's prior psychiatric history, and would want expert advice and guidance. Evidence of drug use or dependency might suggest further inquiry even though not necessarily indicating mental disease or defect. Counsel's representations of problems of communication with the defendant should also be a matter for serious concern, as these raise questions of capacity to stand trial. The suggestion that evidence is required before the court may or must order a psychiatric examination is circular. It is not reasonable to assume that all persons suffering from mental disease or defect exhibit objective manifestations, so that mental examination may not be had unless the need is demonstrated by lay evidence. The very irrationality of the defendant's act and the absence of reasonable expectation of gain from his conduct are circumstances indicating that the possibility of mental disease or defect should be explored.

The defendant is also on solid ground in suggesting that psychiatric evaluation may be important for the penalty phase of the trial, even if there is no substantial claim of mental disease or defect excluding responsibility. Section 565.012.3(2), RSMo 1978 provides that the defendant may show as a mitigating circumstance "[t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." The presence of this circumstance demonstrates the need for

expert guidance in preparing a defense. Other evidence of mental problems is also freely admissible at the punishment phase. *See State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982). The statutes provide adequate grounds for affording such an examination as an essential step in preparation for trial of a capital murder case. Assistance of this kind is probably required as a matter of due process of law, even in the absence of explicit statutory provision.

The state cites two divisional cases: *State v. Haley,* 603 S.W.2d 512 (Mo.1980) and *State v. Ingram,* 607 S.W.2d 438 (Mo.1980). Both of these cases were decided on the basis that the defendant waited until trial was imminent before making known any circumstances which might show that a mental examination was appropriate. In each case the court held that the record did not show substantial facts indicating the presence of mental disease or mental defect. For the reasons just stated they do not control the present situation, in which the need for a mental examination was suggested at an early stage.

Even though it would have been far preferable for the court to have ordered a mental examination, I do not believe that it is necessary to reverse the conviction of capital murder for this reason. The application was technically deficient, and there is no indication in the record that the defense would have been able to demonstrate mental disease or defect sufficient to exclude responsibility. The question whether there might be a viable defense on grounds of mental incapacity could probably be answered on the basis of an examination conducted at the present time,[3] but any such procedure is foreign to this appeal. It is not necessary to set aside the conviction simply because of the highly speculative possibility that a mental capacity defense might have been feasible.

The situation is different as to the sentence of death. The request for an exami-nation for use at the penalty stage was tendered nearly three weeks before trial. There was occasion for it. The application should have been granted. The inquiry as to mental condition at the penalty stage may range far more widely than in the trial of the issue of guilt. It is not possible to determine at this time what the jury might have done at the penalty stage, had it had the benefit of a psychiatric evaluation of the defendant. A death sentence, under these circumstances, should not be sustained.

### 2. The Statutory Aggravating Circumstance

The majority would affirm the death sentence in this case based on the sole aggravating circumstance that the murder was committed "for the purpose of receiving money or any other thing of monetary value by taking [Jordan's] wallet." The majority cites cases from two other states with statutory language identical to ours as supporting its conclusion. Both *Pulliam v. State,* 236 Ga. 460, 224 S.E.2d 813 (1976), and *State v. Woomer,* 277 S.C. 170, 284 S.E.2d 357 (1981), (reversed on other grounds) involved the submission of multiple aggravating circumstances. The latter case did not address the issue here presented.

The majority next examines statutes with the aggravating circumstance that the murder was committed for pecuniary gain and finds that most have applied the circumstance to murders committed during the course of an armed robbery. Inasmuch as defendant fatally shot Officer Jordan in the course of robbing him, the opinion concludes that the aggravating circumstance submitted in this case was supported by substantial evidence.

The defendant's position is that the "receiving money" aggravating circumstance was meant to apply only to a murder for hire, the murder of an insured by a benefi-

---

**3.** The situation is not at all like *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), holding that an immediate inquiry as to a defendant's capacity to waive his right to be present at trial was essential when the defendant disabled himself during trial by a suicide attempt.

ciary, and the murder of an ancestor by an heir to accelerate the inheritance. Such a holding would follow from a strict construction of the statutory language. As noted by the majority, two states with the more expansive "pecuniary gain" statutory language have reached this conclusion. *See Ashlock v. State,* 367 So.2d 560 (Ala.Cr.App. 1978) and *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867 (1977). *See also Boutwell v. State,* 659 P.2d 322 (Okla.Cr.App.1983). *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) would seem to mandate a strict construction of the statutory aggravating circumstances to ensure that the legislature intended to authorize the death sentence under a given set of circumstances.

Even if we reject defendant's argument that the "receiving money" circumstance was not meant to apply to *any* murder during the course of a robbery, it does not automatically follow that every time a defendant on trial for capital murder has taken money or something of monetary value from his victim the statutory circumstance has been established. In *State v. Snow,* 383 A.2d 1385, 1388 (Me.1978), the court upheld a "pecuniary benefit" circumstance when the murder had occurred during a robbery. The court stated:

> [A] "criminal homicide ... committed for pecuniary benefit" includes a homicide committed during a robbery, *provided there is a concurrence of the mental state required for second degree homicide, death producing conduct sufficient to constitute legal cause, and the specific intent to obtain money thereby.*
>
> \* \* \* \* \* \*
>
> A homicide in the second degree which is committed "for" monetary gain therefore requires a showing of specific intent to obtain money by and in conjunction with the conduct and mental state necessary for second degree homicide. This temporal concurrence of mental culpability with conduct producing a prohibited

result is a basic premise of Anglo-American criminal law. (Emphasis supplied). And in *Peek v. State,* 395 So.2d 492, 499 (Fla.1980), the court found that a murder which preceded the theft of the victim's automobile was not committed for pecuniary gain. The court stated: "[t]he record does not support the conclusion that Mrs. Carlson was murdered to facilitate the theft, or that appellant had any intention of profiting from his illicit acquisition." Finally, in *State v. Oliver,* 302 N.C. 28, 274 S.E.2d 183, 204 (1981), the court rejected defendant's claim that the murder of a customer at a gas station-convenience store was not for pecuniary gain because the money had already been obtained from the storekeeper. The court stated: "While the argument is plausible we reject it. The hope of pecuniary gain provided the impetus for the murder of both Watts and Hodge. *This hope and the murders were inextricably intertwined.*" (Emphasis supplied).

The State's description of the events of May 16, 1981, in its brief and arguments both before this Court and to the jury do not give the impression that Samuel McDonald was intent on robbing someone and was willing to kill, if necessary, to retain the benefits. Rather, the impression is that he decided to take someone's wallet and upon realizing that his victim was a police officer decided, because of a general dislike of authority figures or because of a fear of identification by the police officer, to fire the fatal shot. The reason for the murder does not make it any less brutal; it does, however, remove the single approved basis for inflicting the death penalty in this case.

On the sufficiency of evidence supporting the aggravating circumstance, I also concur in the opinion of Houser, Sr. J.

### 3. Closing Argument

In this case, as in many others, the prosecutor engaged in improprieties while arguing that the death penalty was appropriate in this case. This case differs from most others in that defense counsel promptly and consistently objected to those arguments.

Nevertheless, the majority finds that the trial judge did not "abuse his discretion" in allowing the arguments and that counsel should be afforded "wide latitude" in argument during a capital case. As indicated previously, I would opt for more, not less, control when a defendant's life is at stake, but whatever control is exercised should apply equally to defense counsel and the prosecutor. The trial judge, here, exercised much more control over defense counsel than over the prosecutor.

In *State v. Lewis*, 443 S.W.2d 186 (Mo. 1969), this Court held that a prosecutor should not attempt to belittle the jury's duty to set defendant's sentence by arguing the possibility of parole. No objection was made in *Lewis*, but the Court found plain error that warranted reversal. Although this Court has not always found references to the possibility of intervention to rise to the level of plain error, the law is that such references are improper. *California v. Ramos*, —— U.S. ——, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), does not change the law in this respect. In *Ramos*, the United States Supreme Court held that a California law requiring jury instruction indicating that a sentence of life without parole could be commuted did not violate the Eighth and Fourteenth Amendments to the United States Constitution. The Court repeatedly emphasized that the instruction was a *permissible* choice for the state to make but that its decision was not intended to "override the contrary judgment" that the possibility of commutation was an improper consideration. 103 S.Ct. at 3459–60.

The majority dismisses each of McDonald's claims of error as insignificant within the context of the entire argument. Taken individually, the objectionable portions of the argument might not warrant reversal; the argument, however, was rife with error. The prosecutor knew better.

We should not continue to encourage improper argument by dismissing it as "harmless."

### 4. Sentence Review

It is difficult to respond to the sentence review found in the principal opinion because the cases relied on for comparison are not detailed. My examination of the cases in which this Court has upheld death sentences, and in which prosecutors have sought the death penalty but juries have not agreed, persuade me that the sentence should be mitigated.

The only case to date in which we have mitigated a death sentence is *State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982), involving a killing for hire in which the defendant stalked the victim, with one dry run before the fatal shooting. McDonald's acts, by contrast, appear to be impulsive. It is true that another jury refused to impose the death sentence on the person who hired McIlvoy, but McDonald should also be entitled to comparison of that sentence. *State v. Williams*, 611 S.W.2d 26 (Mo. banc 1981). If one examines the external factors, McIlvoy's case seems more willful, deliberate and shocking than this one. The only possible distinction is in the mental factor, and here the denial of any kind of mental examination looms large. McIlvoy hired private experts who testified as to his fragile psyche and weak will. The defendant should not be sentenced to death without the opportunity for similar consideration.

The defendant has a criminal record extending over many years, but the crimes are non-violent. There is no evidence of sadistic excess such as was present in some of the cases in which this Court has sustained death sentences.[4] When robbery alone is the sole aggravating circumstance, juries with some regularity have declined to return death verdicts.[5] I submit that the

---

4. *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983); *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981).

5. *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981); *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981), multiple killing by 19-year-old offender during course of robbery; *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981); *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981). Where death sentences have been ap-

sentence of death was excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

For the plural reasons assigned, and those adduced by Judge Houser, I would affirm the judgment but would set aside the death sentence.

proved for murder in the course of a robbery, other aggravating circumstances have been present. *See State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982)—killing of police officer on duty; *State v. Stokes, supra; State v. Newlon, supra*—"outrageously or wantonly vile, ..."